In re MADISON MANAGEMENT
GROUP, INC., Debtor.

**Bankruptcy No. 91 B 23969.**

United States Bankruptcy Court,
N.D. Illinois, E.D.

Jan. 24, 1992.

Howard L. Adelman, Adelman, Gettleman & Merens, Ltd., Chicago, Ill., for debtor.

Salvatore A. Barbatano, Rudnick & Wolfe, Chicago, Ill., H. Slayton Dabney, Jr., E. Duncan Getchell, Jr., McGuire, Woods, Battle & Boothe, Richmond, Va., for movant (Hampton).

Steven B. Towbin, Towbin & Zazove, Ltd., Chicago, Ill., for movant (Pinellas).

Michael R. Enright, Arvey, Hodes, Costello & Burman, Chicago, Ill., for movant (West Coast).

Karen H. Moore, U.S. Trustee's Office, Chicago, Ill.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING THE MOTION FOR THE APPOINTMENT OF A TRUSTEE AND THE MOTION TO PROHIBIT COMPENSATION AND EXPENSE REIMBURSEMENT TO DAVID ABRAMS

SUSAN PIERSON SONDERBY,
Bankruptcy Judge.

On January 10, 1992 and January 13, 1992, the Court conducted a full and lengthy evidentiary hearing on the Motion of Pinellas County, Florida ("Pinellas"), Hampton Roads Sanitation District ("HRSD") and the West Coast Regional Water Authority ("West Coast") (collectively the "Movants") for the Appointment of a Chapter 11 Trustee and the Motion of Pinellas County, Florida to Prohibit Compensation and Expense Reimbursement to David Abrams.[1] The Court having heard the testimony of the witnesses, Mr. David Abrams ("Abrams") and Mr. James Rudnicki ("Rudnicki"), having reviewed the documents entered into evidence and having heard the arguments of counsel, the Court hereby makes the following findings of fact and conclusions of law pursuant to Rule 7052 and Rule 9014 of the Federal Rules of Bankruptcy Procedure:

### FINDINGS OF FACT

#### The Bankruptcy Case

1. On November 8, 1991, the Debtor, Madison Management Group, Inc., filed a Voluntary Petition for Relief under Chapter 11 of the Bankruptcy Code.

2. After the Petition was filed, the Debtor filed its Schedules and its Statement of Affairs. According to the Sched-ules, the Debtor has in excess of 2,600 creditors, and there are nine separate categories of claims. The Debtor has six different insurance carriers and over thirty policies. The main assets of the estate are potential alter ego causes of action against Great American Management and Investment, Inc. ("GAMI") and Great American Industrial Group, Inc. ("GAIGI"), the parent companies of the Debtor (the "Control Companies"). The Debtor also has preference and fraudulent conveyance causes of action. Lastly, the Schedules indicate that the Debtor had $389,459.43 in cash in bank accounts and has certain real estate presently under executory contract for sale, valued at $189,536. The Debtor's liabilities exceed $160 million.

3. On November 26, 1991, the Official Creditors' Committee was formed.

4. On December 18, 1991, the Court entered Administrative Order No. 1 designating the Debtor to perform claims processing and noticing functions in place of the Clerk of the Bankruptcy Court.

#### History of the Debtor

5. In 1986, GAMI formed the Debtor as an acquisition vehicle to purchase the stock of Clevepak Corporation and Interpace Corporation (hereinafter the "predecessor companies"), and the Debtor subsequently purchased the stock. GAMI owns 100% of the common stock of GAIGI, and GAIGI owns 100% of the Debtor's common stock.

6. The predecessor companies manufactured, distributed and sold pre-stressed concrete pipe and were separate corporations until 1987.

7. In February 1987, the Debtor contributed the ongoing business assets of the predecessor companies to Eagle Industries, Inc., an affiliated company controlled by GAMI. The predecessor companies were then merged into the Debtor. As a result, the Debtor acquired all of the predecessor companies' liabilities including the pipe-

---

**1.** The Official Unsecured Creditors' Committee, Great American Management Group, Inc., Great American Industrial Group, Inc. and the U.S. Trustee support the Motion for the Appointment of a Chapter 11 Trustee. Hampton Roads Sani-tation District, West Coast Regional Water Authority and the Committee also support the Motion to Prohibit Compensation and Expense Reimbursement to David Abrams.

making liabilities and the liabilities for retirement and health benefits of certain employees of the predecessor companies.

8. In March 1987, the Debtor paid GAIGI a $3 million dividend, and in October 1988, the Debtor paid GAIGI a $5 million dividend. In 1988, the Debtor also paid GAIGI approximately $40 million in satisfaction of loans that were not due until 1992.

9. Since 1987, the Debtor's business has consisted of administering various employee benefit plans and defending the numerous lawsuits filed against it and the Control Companies relating to pipe products, asbestos claims and environmental claims. The Debtor has never conducted any business operations and prior to filing did not have any employees. Since 1987, GAMI has controlled the Debtor's cash holdings.

### Current and Former Management of the Debtor

10. In the fall of 1991, Samuel Zell, Sheli Rosenburg, Art Greenburg and Norm Field ("former management") were the directors and officers of the Debtor and/or GAMI and GAIGI. Around that time, David Kurtz, counsel for GAMI and GAIGI contacted Adelman, Gettleman & Merens to discuss the Debtor's financial condition. At that time, the parties recognized that there was a potential conflict of interest in having Kurtz represent the Debtor because all of the Debtor's directors and officers were employed by GAMI and GAIGI and because the Debtor had potential causes of action against GAMI and GAIGI. Shortly thereafter, Adelman, Gettleman & Merens provided former management with several names of persons qualified to manage the Debtor free of any conflict of interest. David Abrams' name was included.

11. David Kurtz did not recommend Abrams to former management or to Adelman, Gettleman & Merens.

12. On or about September 30, 1991, former management interviewed Abrams and discussed his experience with insolvent companies, his experience with publicly-held companies and his hourly rates. Anticipating that he would spend 50% of his time on the Debtor's affairs, Abrams requested $15,000 per month, and he requested an advance payment of six months salary. Abrams accepted the position and received a $45,000 advance payment—three months' salary. Abrams testified that the former president was not receiving a salary. Abrams generally does not put himself on a company's payroll, but in this case the Debtor is withholding taxes from his salary. Abrams is not precluded from conducting other business while he is serving as president of the Debtor.

13. Prior to being interviewed for the position, Abrams had no contact whatsoever with GAMI, GAIGI, their affiliates or their officers and directors.

14. On or about October 4, 1991, all of the former management of the Debtor resigned, and on October 7, 1991, GAIGI, the sole shareholder of the Debtor, appointed Abrams as sole director of the Debtor. Shortly thereafter, Abrams elected himself President and hired Jim Rudnicki as an assistant. Abrams hired Caroline Cram as secretary and Casey Jaskowiak ("Jaskowiak") as an employee. The Debtor spends $7,500 a month for the services of Rudnicki, Cram and Jaskowiak. To date, the Debtor has paid Abrams and his staff $82,000 for services rendered through December 31, 1991 and to be rendered through January 31, 1992.

15. Abrams is a certified public accountant with extensive experience as a financial consultant in bankruptcy reorganizations and financially troubled companies. Abrams is the president of David Abrams & Associates, a crisis management and work out consulting company. Rudnicki and Jaskowiak are employees of David Abrams & Associates. Cram is not an employee of David Abrams & Associates.

16. In this case, Abrams testified that his duties include establishing and collecting the assets of the Debtor, developing a plan, administering the estate, investigating claims and investigating and pursuing any potential causes of action against GAMI and GAIGI. Abrams testified that his duties do not differ from the duties of a

trustee and that if a trustee is appointed, he will cooperate fully with the trustee.

17. Abrams never sought approval of his retention as a professional from the bankruptcy court.

18. Abrams is a personal friend and business associate of David Kurtz, counsel for GAMI and GAIGI. Since 1980, Abrams has been involved in eleven cases where Mr. Kurtz was involved. In nine of the cases, however, Mr. Kurtz was not responsible for Abrams being recommended. In 1991, less than 5% of Abrams' business came from referrals by Mr. Kurtz.

19. Rudnicki, a certified public accountant, has been employed by David Abrams & Associates since November of 1990. Prior to working for David Abrams & Associates, he was the chief financial officer of Quantum Data, and prior to that he spent ten years with Coopers & Lybrand.

20. The Debtor pays Rudnicki a monthly salary of $4,000 and withholds taxes from his salary. Rudnicki also continues to draw a steady salary from David Abrams & Associates.

21. Until Abrams was appointed, the Debtor's office was in GAMI's office. Abrams moved the Debtor's office out of GAMI's office and into 29 South LaSalle Street, Chicago, Illinois and ordered stationery for the Debtor. The Debtor has no furniture and no business equipment.

22. Although Abrams assumed that because he was being appointed sole director of the Debtor he had full voting power of the Debtor's stock, he did not receive the undated Irrevocable Proxy, effective November 24, 1991, from GAIGI until November 22, 1991. The Irrevocable Proxy is effective through December 3, 2001.

### Services Performed by Current Management

23. Pursuant to the Memo from Mark Carter to the Debtor's file dated October 4, 1991, Abrams was contemplating filing for bankruptcy on behalf of the Debtor but the timing had not been determined. It is clear, however, that although GAMI attempted to control the timing of the filing, GAMI and/or GAIGI had nothing to do with the timing of the filing of the Petition.

24. Abrams and Rudnicki have spent between 500 and 550 hours analyzing the affairs of the Debtor. Abrams has spent approximately 200 hours, and Rudnicki has spent approximately 300 to 350 hours. Abrams and Rudnicki testified that nearly everything they do relates to the potential alter ego causes of action against GAMI and GAIGI.

25. Immediately upon his appointment, Abrams began to investigate the Debtor and the creditors' rights. Through the investigation, he was able to identify three employee benefit plans and two pension plans, one of which was made up of seven previously independent pension plans. The plans covered approximately 1,500 former employees of the predecessor companies.

26. Abrams, with the assistance of Rudnicki, interviewed several people and analyzed documents regarding 1) the transfer of several senior notes of Clevepak on April 2, 1986; 2) the contribution of seven operating subsidiaries or divisions of Clevepak to Eagle Industries on February 1, 1987; 3) the $3 million dividend to GAIGI in March 1987; 4) the $5 million dividend to GAIGI in October 1988; and 5) payment of approximately $40 million in loans in 1988 that were not due until 1992.

27. Rudnicki analyzed the causes of action against the estate, the medical and life insurance policies, two pension plans, and workers' compensation and other insurance matters. He also prepared the Schedules and Statement of Affairs and performs the claims processing functions pursuant to Administrative Order No. 1. Rudnicki testified that it would cost in excess of $15,000 to hire an outside company to perform the claims processing function.

28. In his investigation, Rudnicki interviewed several people from Clevepak and Interpace as well as the pension benefits advisors to the Debtor. He reviewed the documents contained in over 40 of the 1,000 boxes of the Debtor's documents. He also reviewed the public filings of the companies.

29. Abrams testified that GAMI has not attempted to control or to hinder or delay his investigation into the alter ego causes of action and has not tried to influence him in any way. Rudnicki also testified that GAMI has not tried to influence him in any way and has not attempted to control or to hinder or delay his investigation.

30. Abrams further testified that he was willing to assign the potential alter ego causes of action against GAMI and GAIGI to the Creditors' Committee or an examiner to pursue and prosecute. Abrams testified that as part of settlement discussions, the Debtor offered the potential causes of action to the Movants.

31. The Debtor has not served any subpoenas or other legal processes on the Control Companies. Thus, it is clear that the Debtor has not yet commenced a formal investigation into the causes of action against GAMI and GAIGI.

32. Abrams testified that the Debtor intends to retain special counsel to investigate and pursue any causes of action against the Control Companies. Rudnicki testified that the Debtor also intends to retain a valuation expert if necessary.

33. The day before the Debtor filed its Petition for Relief, Abrams settled a pending lawsuit arising out of a $650,000 indemnity or contribution claim against GAMI for $250,000. The settlement was based on a similar settlement in the Oklahoma City pipe litigation. The Control Companies engineered the Oklahoma City settlement at a time when they controlled the Debtor. Abrams did not make an independent assessment of the value of the settlement. Abrams testified that in order for the Debtor to have a successful Chapter 11, the company needed cash, and the settlement provided that cash.

34. Because the settlement occurred prior to filing, the Debtor's creditors did not receive notice of the settlement, and the bankruptcy court did not approve the settlement.

35. For some unexplained reason, the Debtor failed to list the settlement in its Schedules.

*The Movants*

36. The Movants' claims against the Debtor exceed $196,000,000 and are based on breach of warranty, breach of contract and fraud. The claims arise out of the predecessor companies' sale of pre-stressed concrete pipe to the Movants.

37. Pinellas has a $26 million judgment against the Debtor that is now on appeal. The other Movants' claims are contested and unliquidated.

38. The Movants seek the appointment of a Chapter 11 trustee because they lack confidence in Abrams because he was appointed by GAMI, and thus, there is the appearance of impropriety. They also allege a Chapter 11 trustee is needed because Abrams settled a claim for $250,000 on the eve of filing without conducting an independent evaluation of the value of the claim and failed to schedule the settlement. The Movants also contend that an independent trustee is in the best interests of the creditors and the estate because the trustee would independently evaluate and pursue any causes of action against GAMI and GAIGI.

39. The Movants represented to the Court, on behalf of their clients, that their clients lacked confidence in Abrams.

40. The Movants failed to provide the Court with any evidence that a trustee or another management consultant would administer the case any differently than Abrams is administering the Debtor's affairs.

41. The Movants failed to provide the Court with any evidence regarding the cost to the estate of a trustee and the professionals a trustee may retain. More importantly, the Movants failed to provide the Court with any evidence that a trustee could perform the services Abrams is providing at a lower cost to the estate.

42. The Movants failed to provide the Court with any evidence of the Debtor's mismanagement, fraud or dishonesty.

43. Any finding of fact may be considered a conclusion of law to the extent appropriate.

## CONCLUSIONS OF LAW

1. The Court has core jurisdiction over the issue of the appointment of a trustee and the issue of Abrams compensation pursuant to 28 U.S.C. § 157(b)(2)(A), (M) and (O).

### Appointment of a Trustee

■ 2. The bankruptcy court must conduct a full evidentiary hearing on a motion for the appointment of a trustee. *In re Microwave Products of America, Inc.,* 102 B.R. 666, 670 (Bankr.W.D.Tenn.1989), *citing, In re Casco Bay Lines, Inc.,* 17 B.R. 946 (BAP 1st Cir.1982). *But see, In re Ionosphere Clubs, Inc.,* 113 B.R. 164, 167 (Bankr.S.D.N.Y.1990) (Although a four-day evidentiary hearing was conducted, a hearing was not required.).

■ 3. In this case, the Movants carry the burden of proof and must show that the appointment of a trustee is necessary under Section 1104(a)(1) or (2) by clear and convincing evidence. *See In re PMH Corp.,* 116 B.R. 644, 646 (Bankr.N.D.Ind. 1989).

■ 4. Generally, courts favor allowing the debtor to continue to manage its own affairs. The appointment of a trustee, therefore, is an extraordinary remedy. *Microwave Products,* 102 B.R. at 670.

■ 5. "The appointment of a trustee should be the exception, rather than the rule." *In re Sharon Steel Corp.,* 871 F.2d 1217, 1225 (3rd Cir.1989) (citations omitted). The bankruptcy court must make the determination on a case-by-case basis. *Id.* at 1226.

6. Section 1104 of the Bankruptcy Code provides:

(a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee—

(1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or

(2) if such appointment is in the interest of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities or the amount of assets or liabilities of the debtor.

. . . . .

11 U.S.C. § 1104 (1988).

7. Section 1104 contains a two prong test for the appointment of a trustee. The bankruptcy court must appoint a trustee if there is cause or if it is in the interests of creditors and the estate.

■ 8. Under Section 1104(a)(1), the Court must appoint a trustee for cause, including gross mismanagement, fraud and dishonesty. The list, however, is not exhaustive. *Microwave Products,* 102 B.R. at 671. For example, lack of confidence in the debtor's management may constitute cause. *See In re Cardinal Industries, Inc.,* 109 B.R. 755, 765 (Bankr.S.D.Ohio 1990). The determination of cause is solely within the bankruptcy court's discretion. *Committee of Dalkon Shield Claimants v. A.H. Robins Co.,* 828 F.2d 239, 242 (4th Cir.1987).

■ 9. In this case, it is undisputed that the Movants are not alleging gross mismanagement, fraud or dishonesty [2]. Instead, they are arguing that their lack of confidence in the Debtor constitutes cause for the appointment of a trustee.

10. The Court finds, however, that the Movants failed to prove a basis for their lack of confidence by clear and convincing evidence. Although the Court has coun-

---

2. If the Movants are alleging that the Debtor's failure to schedule the $250,000 settlement with GAMI the day before the Petition for Relief was filed is dishonest, the Court finds that the Movants failed to provide the Court with clear and convincing evidence to prove it. To the contrary, Rudnicki testified that he thought it might have been overlooked in the rush to file the Schedules and Statement of Affairs and that he was not sure why it was omitted.

sels' uncontroverted representations that their clients do not have confidence in Abrams, which the Movants state is sufficient, the Court does not have any evidence of that position. While counsel are clearly authorized by their clients to set forth their position, that position is not evidence, and the Debtor was not afforded an opportunity to cross examine any witnesses regarding those representations. The Movants allege that their lack of confidence is further evidenced by the fact that GAIGI appointed Abrams and by Abrams conduct in settling a $650,000 claim for $250,000 on the eve of the bankruptcy. Abrams testified that although GAIGI appointed him sole director of the Debtor, GAIGI and GAMI do not have any control over him. He has an Irrevocable Proxy to vote 100% of the Debtor's shares of stock. Abrams also testified that upon his appointment he moved the Debtor out of GAMI's office and into its own office. Most importantly, however, Abrams uncontroverted testimony was that neither GAMI or GAIGI had attempted to influence him or to control or to hinder or delay his investigation into the potential alter ego causes of action against them. Abrams also testified that he settled the claim the day before the Petition for Relief was filed because the estate needed cash in order to reorganize. The settlement, however, may be the subject of a fraudulent conveyance action.

11. Thus, the Court finds that the Movants failed to prove by clear and convincing evidence the basis for their lack of confidence in Abrams.

12. Even if there is no cause to appoint a trustee, Section 1104(a)(2) requires the bankruptcy court to appoint a trustee if it is in the interests of creditors and the estate. In *Ionosphere Clubs, Inc.*, the bankruptcy court held:

> With respect to whether a trustee should be appointed under Code § 1104(a)(2), courts 'eschew rigid absolutes and look [ ] to the practical realities and necessi-

ties,' *In re Hotel Associates, Inc.*, 3 B.R. 343, 345 (Bankr.E.D.Pa.1980). Among the factors considered are: (i) the trustworthiness of the debtor, *In re Evans*, 48 B.R. 46, 48 (Bankr.W.D.Tex.1985); (ii) the debtor in possession's past and present performance and prospects for the debtor's rehabilitation, *In re Parker Grande Development, Inc.*, 64 B.R. 557, 561 (Bankr.S.D.Ind.1986); *In re L.S. Good & Co.*, 8 B.R. 312, 315 (Bankr. N.D.W.Va.1980); (iii) the confidence—or lack thereof—of the business community and of the creditors in present management, *In re Concord Coal Corp.*, 11 B.R. 552, 554 (Bankr.S.D.W.Va.1981); and (iv) the benefits derived by the appointment of a trustee, balanced against the cost of appointment, *In re Microwave Products of America, Inc.*, 102 B.R. 666, 675 (Bankr.W.D.Tenn.1989).

113 B.R. at 168.

13. In this case, the Movants did establish by clear and convincing evidence that there is an appearance of impropriety because GAIGI appointed Abrams as the sole director of the Debtor. Although the mere appearance of impropriety may not be sufficient cause for the appointment of a full trustee, the Court finds that because the potential alter ego causes of action against GAMI and GAIGI are the largest assets of the estate, it is in the best interest of the creditors and the estate to appoint a trustee with limited powers to investigate any and all potential causes of action against GAMI and GAIGI, including, but not limited to, alter ego causes of action, preferences and fraudulent conveyances, including the settlement the day before the petition was filed.

14. In this case, the Movants failed to provide the Court with any evidence regarding the cost to the estate of a trustee and any professionals the trustee may retain[3] balanced against any benefit to the estate. The Movants also failed to prove by clear and convincing evidence that Abrams is not managing the Debtor's af-

---

**3.** When the Court asked Counsel for HRSD what evidence there was regarding the cost of a trustee, he responded that the Court appoints trustees and reviews their fee applications as well as other professionals' fee applications. While the Court may have such experience, the experience is not in this case and is not evidence.

fairs properly or that a trustee would run the Debtor's affairs differently. The Court, therefore, will allow Abrams to continue to administer the Debtor's affairs, including, but not limited to, reviewing and analyzing the insurance policies, reviewing claims, administering the retirees' benefits and processing claims pursuant to Administrative Order No. 1. Although Abrams shall cooperate fully with the Trustee, he shall not continue to investigate any causes of action against GAMI and GAIGI.

### Abrams' Employment and Compensation

15. Pursuant to Section 327(a) of the Bankruptcy Code, a debtor in possession may, with the court's approval, employ professionals that do not hold any interest adverse to the estate and that are disinterested.[4] 11 U.S.C. § 327 (1988). The purpose behind Section 327 of the Bankruptcy Code is to allow the bankruptcy court to control administrative expenses. 2 *Collier on Bankruptcy*, ¶ 327.02 (15th ed. 1991); *In re Willamette Timber Systems, Inc.*, 54 B.R. 485, 488 (Bankr.Or.1985); *In re Morton Shoe Cos.*, 22 B.R. 449, 450–51 (Bankr. Mass.1982).

16. Section 327(b) of the Bankruptcy Code allows the debtor in possession to retain regularly employed professionals on salary if necessary in the operation of the debtor's business. 11 U.S.C. § 327 (1988).

17. Section 1107(b) of the Bankruptcy Code provides that notwithstanding Section 327(a) of the Bankruptcy Code, a person is not disqualified for employment under section 327 solely because the professional was employed by the debtor prior to the commencement of the case. 11 U.S.C. § 1107 (1988). "Although professionals employed by a debtor in possession must be disinterested, an exception [§ 1107(b)] permits the debtor to continue to use those professionals employed by the debtor before the petition was filed. Robert E. Ginsberg, *Bankruptcy: Text, Statutes, Rules,*

§ 4.03(f)(2), p. 330–331 (1991) (footnote omitted).

18. Generally, financial advisors, workout specialists and consultants are, for the purpose of Section 327 of the Bankruptcy Code, "professionals." Thus, their employment must be approved by the bankruptcy court. Officers and employees of the debtor are usually not "professionals," for the purpose of Section 327 of the Bankruptcy Code, and thus, their employment is not subject to court approval. *In re Bartley Lindsay Co.*, 120 B.R. 507, 511 (Bankr.Minn.1990), *citing, Dola International Corp. v. Bordlemay (In re Dola International Corp.)*, 88 B.R. 950 (Bankr. D.Minn.1988); *In re Seatrain Lines, Inc.*, 13 B.R. 980 (Bankr.S.D.N.Y.1981).

19. Form is not determinative. The bankruptcy court should consider the substance of the person's employment over the form in determining whether the person is a professional for purposes of Section 327 of the Bankruptcy Code. *Bartley Lindsay*, 120 B.R. at 512.

20. The determination should be made on a case-by-case basis. A professional is a person whose occupation plays a central role in the administration of the bankruptcy case. *Seatrain Lines*, 13 B.R. at 981 (CEO of the company is a professional.). *See In re United Color Press, Inc.*, 129 B.R. 143, 145 (Bankr.S.D.Ohio 1991) (A professional is a person who plays an intimate role in the reorganization of the debtor.). The following factors should be considered in determining whether an officer of the debtor is a professional:

1. What duties are the officer performing? Are the duties executive in nature or is the officer consulting?

2. Is former management still employed by the company or is there a gap?

3. Is the officer making executive decisions or are others making the decisions?

---

4. Section 101(14)(A) defines a "disinterested person" as a person that is not a creditor, equity security holder or insider of the debtor. Pursuant to Section 101(31)(B)(i), (ii) and (iii) an officer, director or person in control of a corporation is an insider. 11 U.S.C. § 101 (Supp. 1990).

4. Is the officer's primary employment as consultant or work out specialist or is he a trained executive?

5. Is compensation paid directly to the officer or another entity?

6. Does the officer receive fringe benefits?

7. Are income taxes and withholding taxes withheld from the officer's salary?

8. Is the officer's compensation consistent with compensation paid to predecessors?

9. Has the officer been employed to solve the debtor's financial problems or is the employment permanent?

10. Was the officer employed contemporaneous with the filing of the bankruptcy case?

11. Is the officer working full time?

12. Is the officer or his firm paid a retainer?

*Bartley Lindsay,* 120 B.R. at 512.

■ 21. In order to be compensated from the estate, a professional must be employed with court approval. Without such approval, there is no right to compensation. *In re Banhalmi,* 84 B.R. 123, 125 (Bankr.N.D.Ill.1988).

■ 22. In this case, Pinellas contends that Abrams is a professional because he was hired on the eve of the bankruptcy filing to liquidate the assets of the Debtor, because he only works part-time and because he received a $45,000 advance payment or retainer. Pinellas also argues that Rudnicki and Jaskowiak are professionals subject to employment upon court approval. Pinellas concludes that because Abrams and his employees were not retained with court approval, they are not entitled to compensation.

23. In response, the Debtor argues that Abrams is not a professional because he was appointed director of the Debtor pre-petition and in accordance with Delaware corporate law, because he was named president of the Debtor pre-petition and because the Debtor withholds taxes from his salary.

24. Although Abrams is in control of the Debtor and the Debtor withholds taxes from his salary, it is abundantly clear that Abrams is substantively a professional. His duties and responsibilities play a central role in the administration of this estate. He was appointed director and elected president within one month prior to filing. He received a $45,000 retainer or advanced payment. Generally, employees do not receive retainers or advance payments. He works part-time and is not precluded from conducting David Abrams and Associates business. His business background is in workouts and financially distressed companies, and he was hired to liquidate the Debtor's assets and not to run any operating business. The Debtor has never operated a business.

25. Notwithstanding the fact that Abrams is a professional for the purpose of Section 327 of the Bankruptcy Code, because Abrams was appointed sole director and elected president prior to the time the Petition for Relief was filed, Section 1107(b) allows the Debtor to retain Abrams regardless of whether he is disinterested. Accordingly, the Court authorizes the retention of Abrams as a professional. Because Abrams is a professional, his compensation is also subject to court approval.

■ 26. Additionally, regardless of whether Abrams is a court approved professional, Section 105(a) of the Bankruptcy Code [5] allows the Court to review the salaries of officers of the debtor. *See In re Zerodec Mega Corporation,* 39 B.R. 932, 934 (Bankr.E.D.Pa.1984).

27. To date, Abrams has received $60,000 for services rendered. The Court, however, has not had the opportunity to review the nature and extent of the services performed. Abrams shall, therefore, file a fee application for services rendered from the date the Petition for Relief was filed. Additionally, Abrams shall hold the $60,000 received as a retainer until the Court has ruled on any fee application submitted. In

---

5. Section 105(a) of the Bankruptcy Code provides that the "court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105 (1988).

the event that the retainer exceeds any fees awarded, Abrams will have to disgorge the difference to the estate. Abrams shall not continue to draw a monthly salary from the Debtor.

28. The Court further finds that Rudnicki and Jaskowiak are employees of the Debtor and are not professionals for the purpose of Section 327 of the Bankruptcy Code because they do not play a central role in the administration of the estate. Therefore, their employment and compensation are not subject to court approval.

29. Any conclusion of law may be considered a finding of fact to the extent appropriate.

### Conclusion

In summary, the Court finds that the Movants have proved by clear and convincing evidence that the appointment of a limited trustee is in the best interests of the creditors and the estate. Pinellas County, Florida has also proven by clear and convincing evidence that Abrams is a professional for the purpose of Section 327 of the Bankruptcy Code and his compensation is subject to court approval. An Order will be entered contemporaneously with and in accordance with the Court's Findings of Fact and Conclusions of Law.