In re ONTARIO ENTERTAINMENT CORP., Debtor.

Ontario Entertainment Corp.,
an Illinois corporation,
Plaintiff,

v.

Chicago Title and Trust Company as Trustee Under Trust No. 1101946, Charles Canali, Fred Chamanara and 157 West Ontario Partnership, Defendants.

Bankruptcy No. 99 B 6108.
Adversary No. 99 A 00580.

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

Aug. 25, 1999.

Ariel Wessberg, for Movant or Plaintiff.

John D. Lien, Frank W. DiCastri, Chicago, IL, for Respondent or Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

ERWIN I. KATZ, Bankruptcy Judge.

This matter comes before the Court on the Complaint of Ontario Entertainment Corporation ("OEC") for Declaratory Judgment and Other Relief ("Complaint") and Chicago Title and Trust's, as Trustee under Trust No. 1101946, ("Landlord") Motion to Appoint a Trustee ("Motion"). In its Complaint OEC sought the following: a determination that OEC could assume its lease with Landlord; a determination that a Management Agreement between Cousins Club, LLC and Charles Jones II was not a violation of OEC's lease; a determination of the amount of time required for OEC to promptly cure its default of the lease pursuant to 11 U.S.C. § 365(b)(1)(A); injunctive relief to enjoin Landlord from its alleged breach of the covenant of quiet enjoyment and damages for the Landlord's alleged breach of contract and violations of the automatic stay. Following a trial on OEC's Complaint and the Landlord's Motion, the Court enters these Findings of fact and Conclusions of Law:

### FINDINGS OF FACT

1. OEC is an Illinois corporation with its principal place of business at 157 W. Ontario Street, Chicago, Illinois (the "Premises"). On February 25, 1999, OEC filed a voluntary petition under Chapter 11 of the Bankruptcy Code 11 U.S.C. § 101 et. seq. in the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division, to initiate the above-captioned bankruptcy case. Since that date, OEC has been a debtor-in-possession.

2. Landlord is the record title holder of the Premises.

3. Charles Canali ("Canali") and Fred Chamanara ("Chamanara") are the beneficial owners of Landlord (collectively the "Beneficiaries").

4. 157 West Ontario Partnership ("Partnership") is an Illinois general partnership with the Beneficiaries as general partners. The business of the Partnership is to operate and manage the Premises.

5. On or about May 1, 1997, the Beneficiaries entered into a Restaurant Lease and Rider (collectively, the "Lease") with OEC for the Premises which consists of a two-story commercial building with a basement, comprising a total of 12,000 square

feet. The initial term of the Lease was for ten (10) years commencing May 1, 1997 and ending April 30, 2007. The Lease also provides for 3 successive five (5) year options.

6. The stated use of the Premises under the Lease was as "a restaurant, bar, or nightclub or for any other legal purpose" in accordance with Article 5 of the Lease.

7. The Lease provided for monthly base rent payments of $10,000 commencing June 1, 1997 and due on the first day of each month thereafter for the remainder of the term subject to annual increases on the first day of each subsequent lease year of three percent (3%) over the prior year's base rent.

8. In addition to base rent, the Lease provided for additional rent to cover certain expenses and taxes as defined in Article 4 of the Lease.

9. The Lease provided for OEC to deposit, upon execution of the Lease, the sum of $25,000 as a security deposit to be supplemented by further payments of (a) an additional $75,000 upon the earlier of (i) ninety (90) days from the date of execution of the Lease or (ii) the waiver by OEC of contingencies provided for in Article 36 of the Lease; and (b) $10,000 as additional security on or before May 1, 1998.

10. The Rider to the Lease provided that OEC would pay a sum equal to $20,-750 as an initial Tax Adjustment Deposit upon the earlier of (i) ninety (90) days from the date of execution of the Lease or (ii) the waiver by OEC of contingencies provided for in Article 36 of the Lease.

11. The Rider to the Lease provided further that, upon waiver or satisfaction of the Tenant's contingencies provided for in Article 36 of the Lease, Landlord's beneficiary would sell and OEC would purchase for $50,000 the furniture, fixtures and equipment located in the Premises upon commencement of the Lease ("the Personalty").

12. On or about August 7, 1997, the parties modified the Lease by written amendment to provide for a modified payment schedule for all amounts due from OEC to Landlord.

13. On or about December 9, 1997, Landlord sent OEC a "Landlord's Thirty Day Notice" containing a demand for $104,980.00 as rent owing. Landlord waived this notice in writing and entered into a new payment schedule with OEC. The payment schedule included the Base Rent and OEC's other obligations under the Lease. The payment schedule required OEC to make the following payments.

| | |
|---|---|
| $21,000 | 12/9/97 |
| $21,000 | 01/02/98 |
| $21,000 | 02/01/98 |
| $10,000 | 02/20/98 |
| $21,000 | 03/01/98 |
| $10,000 | 03/15/98 |
| $21,000 | 04/01/98 |
| Remaining Balance plus interest | 04/15/98 |

14. Subsequently, OEC paid $21,000.00 on or about December 9, 1997, $21,000.00 on or about January 2, 1998, $21,000.00 on or about February 1, 1998, and $10,000.00 on or about February 20, 1998. OEC failed to pay $21,000.00 on or before March 1, 1998, as was provided in the Payment Schedule appended to Landlord's Thirty Day Notice dated December 9, 1997.

15. On or about March 4, 1998, Landlord issued Landlord's Thirty Day Notice and sent a copy of it to OEC on or about March 10, 1998. This Landlord's Thirty Day Notice sought to terminate OEC's right to possession of the Premises under the terms of the Lease, but not to terminate the Lease, itself. Also, this Landlord's Thirty Day Notice stated that $81,-996.00 was due and owing and that the right to possession would terminate unless payment of this sum was made on or before thirty days after service of this notice.

16. The Lease contains the following provisions:

17.1 *Events of Default.* The occurrence of any one or more of the following matters constitutes a Default by Tenant under this Lease:

(a) Failure by Tenant to pay any Rent when due . . .

Landlord shall give Tenant Notice of Default as provided hereunder, and Tenant shall have thirty (30) days from the date of such notice to cure any such Default . . .

17.2 *Rights and Remedies of Landlord.* If a Default occurs, Landlord shall have the rights and remedies hereinafter set forth . . . (b) Landlord may terminate the right of Tenant to possession of the Premises without terminating this Lease by giving notice to Tenant that Tenant's right to possession shall end on the date stated in such notice, whereupon the right of Tenant to possession of the Premises or any part thereof shall cease on the date stated in such notice . . .

17. On March 30, 1998, OEC sent three letters to Landlord. In one of the letters, OEC objected to the Landlord's Thirty Day Notice dated March 4, 1998.

18. In that same letter, OEC acknowledged it received the Thirty Day Notice on March 10, 1998, and further stated, "Pursuant to the schedule executed by myself and Fred it would appear that $21,000.00 was due on the first day of March and $10,000.00 was due on the fifteenth of March."

19. The Landlord never responded to OEC's letters of March 30, 1998.

20. On April 3, 1998, OEC filed a Complaint for Declaratory Judgment and Other Relief in the Circuit Court of Illinois, County Department, Chancery Division to initiate the case captioned as, *Ontario Entertainment Corp. v. Chicago Title & Trust Company as Trustee u/t/a 1101946, Charles Canali, Fred Chamanara and Scadron Outdoor Advertising,* as Case No. 98–CH–04357 (the "Declaratory Judgment Action"). Subsequently, on or about May 4, 1998, Landlord filed its Answer and Counterclaim in response to this Complaint. In the Counterclaim, the Landlord did not seek to terminate the Lease.

21. In the Counterclaim, Landlord pleaded a Forcible Entry cause of action, claimed OEC unlawfully withheld possession and sought a judgment for possession.

22. As part of the Declaratory Judgment Action, OEC caused to be posted with the Clerk of the Circuit Court of Cook County a Letter of Credit in the amount of $52,000.00.

23. The Letter of Credit expired by its own terms on September 1, 1998, and could be drawn upon by presenting a "Certified Order of Circuit Court of County . . . Court File No. 98 CH 04357."

24. On September 16, 1998, the court in case 98 CH 04357 entered an order setting a trial date of March 23–24, 1999, and also providing "Plaintiff is ordered to pay rent on a continuing basis pursuant to the terms of the Lease between the parties commencing with the September 1998 rent." The order provided the payments be made into an escrow account in the name of DeFrees & Fiske, the attorneys for OEC.

25. The Lease contains the following provisions:

3.1 *Rent* . . . Tenant shall pay an annual base rent (the "Base Rent") . . . in equal monthly installments ("Monthly Base Rent") of Ten Thousand Dollars ($10,000.00) . . . on the first day of each calendar month . . .

4.1 In addition to paying Base Rent, Tenant shall pay as additional rent a sum equal to all Expenses and Taxes . . .

4.4(b) Tenant shall commence payment of monthly installments of Tax Adjustment Deposits on the first day of each calendar month . . . on such date . . . Tenant shall pay to Landlord one-twelfth ($\frac{1}{12}$) of the Tax Adjustment Deposit . . .

4.10 *Additional Rent.* All amounts payable by Tenant as or on account of Rent Adjustments shall be deemed to be addi-

tional rent becoming due under this Lease.

Upon the filing of a Rule to Show Cause, On December 10, the court in 98 CH 04357 entered an order which provided as follows:

Tenant, Ontario Entertainment Corp., is hereby ordered to pay beginning December 1, 1998, as part of "Rent" the monthly real estate tax Rent Adjustment of $4,320.00, into the trust escrow account pursuant to this court's order of September 16, 1998, which remains in effect.

26. On or about October 28, 1998, OEC paid $25,923.00 into the escrow account. On February 1, 1999, OEC paid $25,602.00 into the escrow account. $51,525 was paid from the escrow account for real estate taxes.

Plaintiff should have made the following payments pursuant to the two orders of the circuit court:

| | |
|---|---|
| 9/1/98 | $10,000 |
| 10/1/98 | $10,000 |
| 11/1/98 | $10,000 |
| 12/1/98 | $14,320 |
| 01/01/99 | $14,320 |
| 02/01/99 | $14,320 |
| | $72,960 |

27. The escrow account was set up using the FEIN of the Landlord.

28. Since the filing of the petition on February 25, 1999, OEC has paid Landlord the following rent:

| | |
|---|---|
| 3/8/99 | $14,500 |
| 4/7/99 | $14,500 |
| 5/12/99 | $14,500 |
| 6/01/99 | $14,500 |

29. Prior to the filing of the petition, OEC entered into a Sub–Lease with 157 West Ontario Building Corp., by which the Building Corp. sub-leased the Premises. Also prior to the filing of the petition, the Building Corp. entered into a sub-lease for the Premises with the Cousins Club, LLC.

30. OEC maintains a bank account at the Devon Bank. The Landlord claims rent due from OEC in the amount of $360,-925.00.

31. OEC has as its sole shareholder Lev Stratievsky, and Robert Itzkow ("Itzkow") is its president and sole director. Ontario Building Corp. has as its sole shareholder Lev Stratievsky and Itzkow is its president and sole director. Ontario Service Corp. has Lev Stratievsky as its sole shareholder and officer. The Cousins Club, LLC ("CCL") is an Illinois Limited Liability Company, which currently has as its managing member and majority owner of 51% interest in CCL, Ontario Service Corp. CCL is the licensee of a liquor license issued by the City of Chicago for the service of liquor at the Premises. Prior to OEC's Lease and prior to OEC's acquisition of its 51% interest in CCL, CCL operated the premises for the sale of liquor under its license. Prior to January 4, 1999, CCL operated the tavern at the Premises as OEC's agent and for OEC's benefit.

32. Although CCL has applied for approval of the change in ownership with respect to CCL's liquor license, CCL has not yet obtained that approval. The license continues in effect pending appeal.

33. OEC, Ontario Building Corp. and Ontario Service Corp. have never had any salaried employees. CCL has not had any salaried employees since OEC acquired the Lease to the Premises.

34. OEC only filed recently a federal and state income tax return for 1997, and it has not filed tax returns for 1998. Ontario Building Corp. and Ontario Service Corp. have never filed income tax returns according to Itzkow.

35. On or about January 24, 1999, CCL entered into a written agreement with Charles E. Jones II ("Jones") styled "Management Agreement." Jones has been managing the business operations (bar and nightclub) at the Premises since February 15, 1999.

36. Itzkow signed the sublease between OEC and Ontario Building Corp. for both parties. Itzkow signed the sublease between Ontario Building Corp. and CCL

on behalf of Ontario Building Corp. Itzkow signed the "Management Agreement" between CCL and Jones.

37. On April 12, 1999, the Partnership filed a Proof of Claim in this court by which the Partnership claims that OEC owed the Landlord $258,777.11 pursuant to the terms of the Lease for the period of June 1, 1997 to February 1, 1999 (the "Claim")

38. In filing its Adversary Complaint, OEC elected to assume the Lease pursuant to 11 U.S.C. § 365(d)(4). This election is timely.

39. An actual case and controversy presently exists between the parties for the following reasons:

A. Landlord is asserting that the existence of a Management Agreement between CCL and Jones dated January 24, 1999 is a disguised sub-lease of the Premises, and thus, a violation of Article 13.1 of the Lease. OEC asserts that Jones is OEC's agent, and that Article 13.1 of the Lease allows OEC to have an agent occupy the Premises without the Landlord's prior approval. Article 13.1 of the Lease provides the following:

Tenant without the written consent of Landlord in each instance, shall not ... (d) permit the use or occupancy of the Premises or any part thereof for any purpose not provided for under Article 5 of this Lease or by anyone other than Tenant and Tenant's agents and employees.

B. Landlord is asserting that $258,777.11 is due to Landlord from OEC under the terms of the Lease. On the other hand, OEC asserts that it is entitled to substantial reductions, set-offs and credits against the Landlord's claim for pre- and post-petition breaches of the Lease.

C. OEC had asserted two defenses that it has since waived: (1) Landlord's acceptance of rent payments after a default notice invalidates its notice; and (2) an inaccuracy in a default notice renders it invalid.

40. The Rider to Restaurant Lease between OEC and the Landlord contains the following provision: "Sale of Personalty ... Landlord's beneficiary shall sell to Tenant ... the Personalty ... located in the Building, and as depicted on the video tape prepared by Tenant and delivered to Landlord upon the execution of this Lease. The Purchase Price for the Personalty shall be $50,000.00 ... Landlord's beneficiary shall convey the Personalty to Tenant by Bill of Sale." Although OEC paid the $50,000 sale price of August 8, 1997, Tenant has never delivered a video tape of the Personalty to Landlord.

41. The Rider to Lease provided that the purchase price of the Personalty was $50,000.00, payable August 1, 1997. By Amendment to Lease of August 7, 1997, OEC and Landlord agreed that the $50,000.00 payment would be made September 20, 1997, but would include interest of $840.00, for a total payment of $50,840.00. OEC paid $50,000.00 on September 22, 1997.

42. OEC's position is that it has received notice of a claim of an adverse interest of certain third parties in the personalty. There is, however, no evidence of any such notice or third party interests in the Personalty, except those created by the acts of OEC.

43. Landlord and Scadron Outdoor Advertising ("Scadron") entered into a signage lease for the east side of the exterior of the building in which the Premises are located.

44. Scadron, with the consent of Landlord, erected an outdoor billboard on the east side of the exterior of the Premises and in so doing boarded over the window of the second floor of the Premises.

45. Itzkow, president of OEC, testified that he was aware of the Scadron sign. It is unclear when the second floor window on the east wall was covered. Mr. Itzkow testified they opened for business on November 27, 1997, but he testified Scadron

did not install its sign until October 1998, which was after the letter of March 30, 1998, complaining of the sign, and which said the sign was installed "recently." Canali testified about a photograph of the east wall taken "about a year ago" and which does not show a sign, but only a painted brick wall saying "Advertise Here" and a painted board over the window. Accordingly, it is unclear exactly when the window was covered.

46. Itzkow's position is that said window was critical to the full enjoyment and use of the Premises because the area of the second floor of the Premises served by said window was the "cigar bar" which utilized the window for light and ventilation for the comfort of OEC's patrons prior to the erection of the sign.

47. No specified or credible evidence was presented to show that covering the second floor east window substantially deprived OEC the use of the premises. The evidence to the contrary is substantial and may be summarized as follows:

a. Itzkow testified that when OEC leased the Premises, he was aware of the Scadron sign.

b. Jones testified he used the area as a VIP Room and he gave no testimony about a closed window.

c. Itzkow did not complain about the window until a letter of March 30, 1998, after Landlord had served the Thirty Day Notice.

d. While Itzkow testified that the obstruction of the window caused OEC to move the location of the cigar bar, however, he did not testify whether OEC lost any quantified revenue.

48. The evidence presented by OEC is not persuasive. There is no evidence that OEC could not use the Premises for the purposes intended.

49. The signage erected by Scadron on the east side of the exterior of the Premises is illuminated by electrical lighting.

50. OEC's position is that the electrical lighting has been tied into OEC's electric power meter without its permission. However, no evidence was presented that the electrical lighting for the sign was or is tied into OEC's electric meter. OEC dismissed Scadron from the state court litigation.

51. OEC presented no evidence of what its added electrical costs have been even if the sign lights went through OEC's meter. Moreover, OEC sublet the Premises to Ontario Building Corp. at a fixed rent and Ontario Building Corp., either itself or via another entity paid all utility expenses.

52. On or about January 24, 1999, CCL entered into a written contract styled "Management Agreement" with Jones "to perform as agent of CCL." According to the Management Agreement, Jones is to:

− "supervise, direct and control the management of the Premises"

− "in its sole discretion ... direct and determine the programs and policies to be followed in connection with the operation of the Premises"

− "be an independent contractor"

− hire and have under his "control" all employees working at the Premises

− Pay, "on behalf of CC" all expenses incurred in operation of the Premises

− Receive a "management fee" equal to monthly gross sales, less $20,000 a month, less all monthly expenses, less three percent of monthly gross sales—$20,000—(Gross Sales × .0975).

− Pay on CCL's behalf the $20,000 per month "payable to CCL's Landlord 157 West Ontario Building Corporation as rent"

Jones does business under the name "Club Inta's". Whatever income is left over after payment of expenses is his. He decides into which bank he deposits revenue. One bank account is in the name of Club Inta's. He signs all checks from both bank accounts. Club Inta's hires all the employees and makes all hiring and firing

decisions. He decides what entertainment to hire. He sets salaries, including his own, which is included as an expense item. He sets the hours the Premises are open for business. He made the decision to do certain remodeling, such as removal of the stage, when he took over. He basically controls the entire operation.

53. From January 4, 1999 to the present, OEC has used and intends to continue to use the proceeds received from Jones to pay monthly rent to Landlord.

54. Jones testified that he called Canali in February 1999 and asked for a meeting with Canali. Jones met at the Premises with Canali, introduced himself as the new manager, and expressed an interest in buying the building. Canali asked for a copy of the Management Agreement and said there was overdue rent.

55. Canali and Chamanara returned to the Premises on or about February 22, 1999. Jones again said he was "very interested in buying the club." Jones, on February 22, 1999, faxed Canali a Management Agreement between Club Inta's Productions, Inc. and CCL. Otherwise, no business was discussed at this meeting.

56. Canali learned from his attorney on March 3, 1999 while driving in his car downtown for a hearing in the state court action that OEC had filed a petition to initiate a bankruptcy case. Canali was told that the filing of the bankruptcy petition stayed the state court action against OEC and its assets.

57. Jones testified that Canali telephoned him on March 3, 1999, and Canali informed Jones that OEC had filed bankruptcy. Canali said that if Jones paid "the LLC," Jones would be hurting Canali and Chamanara. Jones testified that he tried to talk around the issue and did not give Canali an answer. Jones contacted Itzkow to confirm that OEC had filed bankruptcy.

58. According to Jones, about a week later Canali telephoned Jones and had essentially the same conversation as before, namely that Jones should not pay the LLC because that would "hurt him" and that Jones would get the deal he wanted. Jones again gave no answer. Jones further testified that on or about March 30, 1999, Canali called again and told Jones that if Jones paid the rent, Jones would never have a deal with Chamanara and Canali. This was the last conversation between Jones and Canali, and despite the requests of Canali, Jones testified that he made all payments to or on behalf of CCL, pursuant to the "Management Agreement."

59. Pursuant to 11 U.S.C. § 362 of the Bankruptcy Code, the filing of the Voluntary Petition operated as a stay, applicable to all entities, among other things, of any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate.

60. Pursuant to Section 541(a)(6) of the Bankruptcy Code, $14,500.00 per month received by OEC from Jones pursuant to the Management Agreement constitutes property of the estate, as "proceeds, rents or profits" as a result of OEC's interest in the Premises.

61. OEC's position is that Canali's efforts to cause Jones to cease making payments under the terms of the Management Agreement following the filing of the Voluntary Petition constitutes a willful violation of the automatic stay.

62. OEC's position is that as a direct, proximate and foreseeable result of the foregoing violations of the automatic stay, OEC has been damaged; however, that allegation is totally unsupported by the evidence. There is no evidence that Jones failed to make any payments under its "Management Agreement." or that OEC suffered any damages from whatever violation of the automatic stay, if any, occurred.

63. OEC's position is that Canali's alleged violations of the automatic stay constitute breaches of the Lease, among other reasons, by breaching OEC's rights to quiet enjoyment of the Premises, for which

OEC is entitled to damages in an amount determine by this court, including punitive damages. However, OEC presented no evidence of any damages or loss.

64. Although Jones pays $20,000 a month to Ontario Building Corp., which in turn pays $14,500 to OEC, Itzkow did not clearly explain what happened with the other $5,500. There is no evidence that Ontario Building Corp. performs any services.

65. According to Jones, he has made a profit every month and has paid a percentage to CCL pursuant to the terms of the "Management Agreement."

66. Jones and Itzkow testified they could not remember what the gross revenue, expenses and profits had been since Jones began operating the Premises. Jones further testified that he provided monthly income and expense statements to Mr. Itzkow.

67. On April 28, 1999, Landlord filed its Request for the Appointment of a Trustee (the "Motion").

68. In the Motion, Landlord alleges that OEC has failed to perform its obligations as a debtor-in-possession and otherwise observe the formalities mandated by the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and the Operating Instructions Reporting Requirements of the Office of the United States Trustee.

69. OEC filed its Schedules and Statements of Financial Affairs OEC has filed its Debtor–in–Possession reports for the months of March and April 1999. OEC has also made rent payments for March, April, May and June, 1999. On March 31, 1999, Itzkow, the duly appointed representative of OEC, attended the first Meeting of Creditors. At the First Meeting of Creditors, Itzkow and counsel for OEC, Ariel Weisberg responded to questions that were posed by the Office of the United States Trustee and an attorney from Foley and Lardner. One of the questions to which OEC's representatives did not have an immediate response was whether there was any money remaining in escrow with OEC's former attorneys, DeFrees & Fiske.

70. After the First Meeting of Creditors, Mr. Weissberg contacted Tim Buckley of DeFrees & Fiske to inquire as to whether there were any funds in DeFrees & Fiske's escrow belonging to OEC. Tim Buckley contacted Mr. Weissberg and informed him that there were, indeed, funds in the DeFrees & Fiske escrow and that these funds would be tendered to Mr. Weissberg. On or about April 16, 1999, DeFrees & Fiske tendered the sum of $8,507.03 to OEC representing the balance of the monies in the court-ordered escrow account. On April 20, 1999, Mr. Weissberg tendered to Itzkow a check in the amount of $8,547.03 from DeFrees & Fiske for deposit in OEC's debtor-in-possession account.

71. OEC's Statement of Financial Affairs lists InterPacifica, Inc. as a $350,000 secured creditor of OEC. Lev Stratievsky has an equity interest in InterPacifica, Inc.

72. OEC signed a promissory note for $350,000 in favor of InterPacifica, Inc., on April 1, 1998. On the same day, OEC gave InterPacifica, Inc., a security interest in all the fixtures and personal property at the Premises. This occurred shortly after OEC received Defendants' Thirty Day Notice.

73. There is no evidence of what consideration InterPacifica, Inc., provided for the $350,000 note and security interest. In its financial schedules, OEC merely says "for value given, including InterPacifica's posting of a letter of credit in the amount of $50,000."

74. OEC's financial schedules list Itzkow as an unsecured creditor for some unknown amount. Although Mr. Itzkow signed the schedules, he testified that although OEC owed him money for legal services, he did not know how much that was.

75. Although OEC lists personal property of furniture, restaurant fixtures and restaurant equipment, it claims the value is unknown even though it demands a bill of sale from Defendants in return for a $50,000 payment. Itzkow testified OEC had leased the furniture and equipment to Ontario Building Corp., but he did not know if that was by a written lease. Mr. Itzkow also testified that Ontario Building Corp. has an option to purchase the furniture and equipment, and that Jones has agreed in substance to buy the furniture and equipment for $100,000 down with the balance paid over eighteen months.

76. OEC does not contest the Defendants' Proof of Claim or the updated statement of the rent owing. The amount owing as of June 1, 1999, is $360,925.00. OEC paid $14,500 by check on June 1, 1999.

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and Local General Rule 2.33(A) of the United States District Court for the Northern District of Illinois. This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A).

## CONCLUSIONS OF LAW

### LEASE AND MANAGEMENT AGREEMENT

Article 13.1 of the Lease provides that "Tenant, without the prior written consent of Landlord in each instance, shall not . . . (d) permit the use or occupancy of the Premises or any other part thereof for any purposes not provided for under Article 5 of this Lease or by anyone other than Tenant and Tenant's agents and employees."

An agent is "one who undertakes to manage some affairs to be transacted for another by his authority, on account of the latter, who is called the principal, and to render an account." *Brunswick Leasing Corp. v. Wisconsin Cent., Ltd.,* 136 F.3d 521, 526 (7th Cir.1998) (citing *Wargel*

*v. First Nat'l Bank of Harrisburg,* 121 Ill.App.3d 730, 77 Ill.Dec. 275, 460 N.E.2d 331, 334 (1984)). The right to control the method or manner of accomplishing a task by the alleged agent, as well as the agent's ability to subject the principal to liability is the test for an agency relationship. *Id.* The burden of establishing the existence of an agency relationship is on the party asserting its existence. *Matthews Roofing Co. v. Community Bank & Trust Co. of Edgewater,* 194 Ill.App.3d 200, 206, 141 Ill.Dec. 143, 148, 550 N.E.2d 1189, 1193 (1990).

The Management Agreement indicates that CCL attempted to paper the relationship with Jones as its agent. By the substance of the Management Agreement, however, as confirmed by the testimony of Jones and Mr. Itzkow, Jones is clearly not an agent but rather an independent contractor. He has complete control over the Premises and the operation of the nightclub; there is therefore a violation of Article 13.1. Jones controls the money, the personnel, sets the salaries of the personal, the entertainment, the decorating and the hours of operation. In addition, the nightclub operates under the name Club Inta's, an entity associated with Jones. Finally, Jones does not receive a fee from CCL; rather he keeps all the money except for $20,000 and a percentage fee pursuant to a formula. Jones' employment as an independent contractor instead of as an agent renders OEC in default of the Lease.

### TERMINATION OF THE RIGHT OF POSSESSION

If there has been a default in an unexpired lease, the debtor may not assume the lease unless the debtor "cures, or provides adequate assurance that [it] will promptly cure, such defaults." 11 U.S.C. § 365. The debtor must also provide adequate assurance of future performance under the lease. 11 U.S.C. § 365. As already discussed, there has been a default

in the Lease. The remaining issue is whether the Lease is unexpired.

 The primary consideration of a court in construing a lease is to effectuate the intent of the parties as expressed in the language of the document when read as a whole. *Midland Management Co. v. Helgason,* 158 Ill.2d 98, 103, 196 Ill.Dec. 671, 674, 630 N.E.2d 836, 839 (1994). Article 17.2 of the Lease indicates the intentions of the parties: to give Landlord the right to terminate the right of possession without terminating the Lease. There is nothing improper with this type of agreement. *Elliott v. LRSL Enterprises, Inc.,* 226 Ill.App.3d 724, 729, 168 Ill.Dec. 674, 677, 589 N.E.2d 1074, 1077 (2nd Dist.1992). In *Elliott* a landlord and tenant had entered into a lease which provided that termination of possession would not affect rent payment obligations. The tenant failed to pay rent and the landlord filed a suit for forcible entry and detainer. The landlord and tenant reached an agreement before trial terminating the tenancy and determining the amount of rent owing to the landlord. After receiving a judgment, the landlord sued the tenant for breach of contract seeking the rent due under the lease for the period of time subsequent to the "termination of the tenancy". The court held that the provision of the agreed order, that "tenancy is terminated," did not extinguish tenant's obligation to pay the balance of the rent due under the lease, in light of the lease provision. The court in *Elliott* stated the following:

> The mere surrender of possession of the building leased, though made upon demand by the plaintiffs based upon a default in the payment of an installment of the rent, should not terminate said contract altogether, but only the defendant's right to the possession of the building leased, thus leaving all the other provisions of the contract, as well as the defendant's obligation to pay the stipulated consideration, in full force.

*Id.,* 226 Ill.App.3d at 730, 168 Ill.Dec. at 678, 589 N.E.2d at 1078 (citing *Heims*

*Brewing Co. v. Flannery,* 137 Ill. 309, 27 N.E. 286 (1891)). *In re Williams,* 144 F.3d 544 (7th Cir.1998), which the parties rely on, is inapposite. In *Williams* the question was whether the lease was terminated so that there was no estate interest post petition. *Id.* Here, Landlord has exercised its right to seek possession rather than termination of the lease. OEC may seek to assume it under § 365.

 OEC requests eighteen months to cure the default on the unexpired Lease which it wants reduced by set-offs. The income to cure will allegedly come from Jones purchasing the Personalty located at the Premises. There was no testimony, however, that Jones has sufficient financial resources to provide adequate assurance to pay. This Court finds that eighteen months does not constitute a prompt cure under the Bankruptcy Code.

**RIGHT TO SET–OFF AND INJUNCTIVE RELIEF**

 OEC asserted many claims for set-offs and injunctive relief due to an alleged breach of the covenant of quiet enjoyment and breach of the contract. OEC, however, did not provide adequate testimony or proof for any of its claims. This Court, therefore, finds that OEC has no right to set-offs against the rent claims of Landlord or to injunctive relief for Landlord or its agent's alleged pre- and post-petition breaches.

OEC also alleges that it is entitled to set-offs against the rent claims for violations of the automatic stay.

The filing of a petition in bankruptcy operates as a stay as to "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3).

 If a willful violation of the stay occurs, the Bankruptcy Code provides the individual debtor with compensatory damages. 11 U.S.C. § 362(h). However, this

Court has held that a corporate debtor such as OEC does not have standing to assert violations under § 362(h). *In re Material Corp., Inc.*, 206 B.R. 933 (Bankr. N.D.Ill.1996)(Katz, J.)

■ Moreover, a sanction of $175,000, which is the amount that OEC requests that Landlord's proof of claim be reduced by, is an amount almost equal to eighteen months Base Rent, and is clearly unwarranted. Where OEC has shown no damages, the facts of this case warrant nothing beyond an admonition.

## APPOINTMENT OF A TRUSTEE

■ Section 1104 contains a two-pronged test for determination of whether to appoint a trustee. The bankruptcy court must appoint a trustee if cause exist or if it is in the interest of creditors and the estate. 11 U.S.C. § 1104; *In re Madison Management Group, Inc.*, 137 B.R. 275 (Bankr.N.D.Ill.1992).

■ There is an inexhaustive list, contained in § 1104, of what constitutes cause for purposes of appointment of a trustee: fraud, dishonesty, incompetence, or gross management of the affairs of the debtor by current management. *Id.;* 11 U.S.C. § 1104(a)(1). The determination of cause is solely within the discretion of the court. *In re Sharon Steel Corp.*, 871 F.2d 1217, 1226 (3d Cir.1989). The party requesting the appointment of a trustee, carries the burden of proof and must show that appointment of a trustee is necessary under § 1104(a)(1) or (2). *Id.* Decisions regarding appointment of a trustee must be made on a case-by-case basis. *Id.*

■ Generally, as Chapter 11 is designed to give the debtor an opportunity to rehabilitate through reorganization, the bankruptcy court favors the debtor to remain in possession and operate the business. *In re Microwave Products of Am., Inc.*, 102 B.R. 666, 670 (Bankr.W.D.Tenn.). "Very often the creditors will be benefitted by continuation of the debtor-in-possession, both because the expense of a trustee

will not be required, and the debtor, who is familiar with his business, will be better able to operate it during the reorganization case." *Sharon Steel*, 871 F.2d at 1226. "[The] appointment of a trustee should be the exception, rather than the rule." *Id.* at 1225; *see Madison Management*, 137 B.R. at 281(the appointment of a trustee is an extraordinary remedy).

■ Although the Landlord has expressed several reasons why a trustee should be appointed, the major concern was the disposition of the monthly $5,500 remaining from the $20,000 in rent paid by Jones. Since the parties agreed in Court to have the $5,500 placed into an escrow account only to be withdrawn upon order of court the need for a trustee is minimized.

## CONCLUSION

■ OEC defaulted on the Lease by failing to make rent payments as they became due and by having Jones act as an independent contractor instead of as an agent. The Lease provided that Landlord could terminate the right of possession without termination of the Lease, which is what Landlord sought to do. Under § 365, because there has been a default but the lease has not expired or been terminated, OEC has a right to assume the Lease provided that it promptly cures its default. That cure must provide the following within a 30 day period from the date hereof: (1) payment in full of all amounts due to Landlord, which as of June 1, 1999 is $360,925.00, in addition to any defaults that have accrued since June 1; (2) rescission of the Management Agreement with Jones and termination of Jones and Club Inta's possession of the premises. Lastly, a trustee will not be appointed because Landlord has not proven that one is needed.