**In re 4 C SOLUTIONS, INC., Debtor.**

**No. 02–84536.**

United States Bankruptcy Court, C.D. Illinois.

Jan. 16, 2003.

Barry M. Barash, Galesburg, IL, for debtor.

Neal H. Levin, Chicago, IL, Richard A. Davidson, Davenport, IA, Nicholas J. Bertschy, Peoria, IL, for creditor.

## OPINION

THOMAS L. PERKINS, Bankruptcy Judge.

This matter is before the Court on alternative motions by BANK AUSTRIA CREDITANSTALT CORPORATE FINANCE, INC. ("BANK AUSTRIA" or "BANK") to dismiss this Chapter 11 case, to convert it to Chapter 7, or for appointment of a trustee. The Court heard evidence over two days, from nine witnesses, and admitted into evidence twenty-seven documentary exhibits consisting of more than two hundred pages. In addition to the Debtor, 4 C SOLUTIONS, INCORPORATED ("DEBTOR"), and BANK AUSTRIA, the U.S. Trustee participated in the evidentiary hearing, at the conclusion of

which, the Court took the matter under advisement.

### FINDINGS OF FACT

1. The DEBTOR, an Illinois corporation, was formed in 1995 by Ashok Kartham.

2. Ashok and his wife, Anu, have been the sole Directors since incorporation.

3. Ashok is the President and Anu is the Secretary.

4. 4 C Solutions Holding Co. owns 100% of the stock of the DEBTOR.

5. The stock of 4 C Solutions Holding Co. is owned as follows:

   Ashok Kartham          55%
   Bank of Austria         41%
   Phil Cunningham          4%

6. The DEBTOR began as a service company, providing professional staffing services in the information technology field, such as computer software programmers.

7. The business grew rapidly, reaching a peak of $18.5 million in annual sales revenue in the first half of 2000.

8. Shortly thereafter, the bottom dropped out of the DEBTOR'S business and its revenues declined sharply, leveling off during 2002 at $4 million annually.

9. The DEBTOR'S largest creditor is BANK AUSTRIA, owed a loan balance in excess of $3.1 million as of September 30, 2002.

10. The DEBTOR and BANK AUSTRIA commenced their debtor-creditor relationship on August 2, 1999. To secure its loan, BANK AUSTRIA took a security interest in all of the DEBTOR'S assets.

11. BANK AUSTRIA is both a lender to and an investor in the DEBTOR.

In consideration for its 41% interest in 4 C Solutions Holding Co., the BANK invested an additional $1.5 million in 1999.

12. In August, 2000, with the DEBTOR in default, and the loan in "work-out" status, BANK AUSTRIA entered into a forbearance agreement with the DEBTOR.

13. The DEBTOR has made no payments to BANK AUSTRIA since August, 2000.

14. Prior to May, 2000, BANK AUSTRIA and the DEBTOR negotiated an agreement that the DEBTOR would hire a turnaround consultant. The DEBTOR was to seek out and recommend the consultant of its choice, subject to BANK AUSTRIA'S approval.

15. In May and June, 2000, James M. Rubenstein, President of Alert Consultants, Inc., was identified by the DEBTOR as the turnaround consultant of its choice and was subsequently approved by BANK AUSTRIA.

16. Rubenstein's retention agreement, documented by letter dated August 3, 2000, provided that he would be paid $2,400 per week, payable half by BANK AUSTRIA and half by the DEBTOR.

17. Rubenstein was retained, in part, to value the DEBTOR'S business. He determined its value to be $23 million as of July, 2000. He acknowledged at trial that the information technology industry peaked at that time. Thereafter, the "bubble burst," multiples declined, and business values depreciated rapidly.

18. Rubenstein's continuing services included efforts to help the DEBTOR increase revenues and decrease ex-

penses in order to return the company to profitability.

19. Part of Rubenstein's duties were to provide current, reliable financial information to BANK AUSTRIA. He provided weekly cash flow statements and monthly annotated financial statements to the BANK.

20. Rubenstein considered himself to be an intermediary between BANK AUSTRIA and the DEBTOR. Both parties used Rubenstein to communicate proposals and responses to each other as part of the ongoing work-out negotiation from August, 2000, through September, 2002.

21. Over time, the DEBTOR'S business expanded to include a product development aspect. The product side of its business accounted for no more than 10% of its revenues.

22. In early 2001, based upon the nature of the services that the DEBTOR was providing to one or more major customers, Ashok identified a market niche for a new software program product. The program is designed to enable businesses that provide a warranty on equipment to efficiently track each piece of warranted equipment and administer the warranty services. Ashok named this new product "iWarranty."

23. Between early 2001 and September, 2002, the DEBTOR committed substantial resources to the creation and development of iWarranty, estimated conservatively at $2 million, consisting largely of employee time, all of which was non-revenue producing.

24. As conceived to date, iWarranty consists of five independent modules, all relating to warranty pro-

gram administration, but distinct enough to be marketed individually. Only two modules are presently near completion.

25. Implementation of the two iWarranty modules that are nearest completion would require substantial future services by a knowledgeable team of professionals, including the creation of user manuals and an on-line assistance program, as well as intensive on-site services to integrate the product into the customer's existing system.

26. Since December, 2001, five to ten sales proposals for one or more of the iWarranty modules have been made by the DEBTOR'S sales staff and at least twenty product demonstrations have been made.

27. The scope of BANK AUSTRIA'S security interest includes iWarranty.

28. BANK AUSTRIA was kept apprised of the ongoing development of iWarranty.

29. Another part of Rubenstein's role was to identify and solicit venture capital investors willing to infuse cash into the business and, alternatively, to identify and solicit potential purchasers willing to buy all or part of the DEBTOR'S business.

30. In July, 2000, with BANK AUSTRIA'S consent, the DEBTOR entered into a revolving credit facility with Gibraltar Financial Corporation under which Gibraltar would loan up to $600,000 to the DEBTOR secured by a first priority lien on accounts receivable. BANK AUSTRIA subordinated its security interest in receivables to Gibraltar. At the time of the bankruptcy filing, Gibraltar was fully secured and has been paid in full post-peti-

tion through collections on the receivables. The excess pre-petition receivables, undetermined as to amount, are BANK AUSTRIA'S collateral, which the DEBTOR has not sought to use.

31. Rubenstein experienced difficulty in attracting either venture capital investors or purchasers due, in part, to the large amount of debt owed BANK AUSTRIA, which was largely unsecured debt.

32. One option discussed on an ongoing basis between the DEBTOR and BANK AUSTRIA was the possibility of "spinning off" the product side of the business, viz. iWarranty, into a separate entity unencumbered by BANK AUSTRIA'S debt. All parties agreed that this would make the new entity much more attractive to both potential investors and purchasers.

33. The parties never reached an agreement on all of the terms and conditions of such a spin-off. Most significantly, they could not agree on how much of BANK AUSTRIA'S debt would follow the new company, what equity interest BANK AUSTRIA would have in the new company, and what percentage royalty would be paid back to the DEBTOR corporation by the new corporation in consideration for the transfer of iWarranty.

34. BANK AUSTRIA viewed iWarranty as a major asset of the DEBTOR that had substantial value. The BANK'S hope and expectation that iWarranty would come to fruition was the major reason the BANK went along with the DEBTOR through September 1, 2002, despite receiving no debt service payments since August, 2000.

35. On August 21, 2002, the parties met to discuss the DEBTOR'S financial situation, and to continue negotiations regarding splitting the company up in order to sell the service side and obtain venture capital for the product side. From the perspective of James Rubenstein, who attended the meeting, the DEBTOR and BANK AUSTRIA had a basic agreement on seven out of nine points relating to the structure of the new entity, although still no agreement as to the BANK'S debt and/or equity, or as to the royalty percentage. From the perspective of Scott Obeck, the BANK AUSTRIA loan officer responsible for the DEBTOR'S account, the parties were still not close to an agreement.

36. At some point between the August 21, 2002 meeting and the second week of September, 2002, the DEBTOR, without the knowledge or consent of BANK AUSTRIA, retained RSM MCGladrey, Inc., to issue an opinion letter about alternative techniques, from a tax perspective, to separate the product side of the business from the service side. RSM McGladrey issued its opinion letter on September 16, 2002.

37. On September 13, 2002, WARRANTYSOFT, INC. was incorporated as an Illinois corporation by Ashok who owned 100% of its stock. The new corporation was formed without the knowledge or consent of BANK AUSTRIA.

38. Ashok testified that he intended that BANK AUSTRIA would be given the same minority equity interest in WARRANTYSOFT, INC., that it had in 4 C Solution Holding

Co. He intended that iWarranty would be licensed by the DEBTOR to WARRANTYSOFT, INC., and that the DEBTOR would be paid a royalty as compensation for the transfer. He told Rubenstein of the incorporation of WARRANTY-SOFT, INC., shortly after it occurred.

39. WARRANTYSOFT, INC., was intended by Ashok to be the entity that would effect the spin-off of the product side of the DEBTOR'S business.

40. Ashok intended that iWarranty would be transferred to, and its development continued by, WARRANTYSOFT, INC. No documentation was ever created to effect the transfer of iWarranty from the DEBTOR to WARRANTYSOFT, INC.

41. In conjunction with the formation of WARRANTYSOFT, INC., Ashok caused approximately twelve employees to be terminated from their employment with the DEBTOR and immediately reemployed by WARRANTYSOFT, INC.

42. Within two weeks or so, WARRANTYSOFT, INC., ceased to function. Its twelve employees were paid a total of $30,000, which was funded by the DEBTOR.

43. WARRANTYSOFT, INC., subleased space from the DEBTOR but never paid any rent. The twelve employees made no physical move of their work location as a result of their termination by the DEBTOR and rehiring by WARRANTYSOFT, INC.

44. All remaining funds that the DEBTOR had transferred to WARRANTYSOFT, INC., after payment of payroll, were returned to the DEBTOR. The twelve employees were rehired by the DEBTOR and, in effect, treated as if there had been no transfer of their employment.

45. In February, 2002, because of its negative cash flow, the DEBTOR stopped making its payroll tax withholding payments. Between that time and the filing of the bankruptcy petition on October 3, 2002, a payroll tax liability accrued of approximately $800,000. BANK AUSTRIA was aware that the payroll taxes were not being paid.

46. As a result of the unpaid payroll taxes, the IRS issued on August 12, 2002, a notice of intent to levy on the assets of the DEBTOR. A copy of the notice was faxed by the DEBTOR to BANK AUSTRIA'S attorney on September 19, 2002.

47. In 2001, Ashok borrowed funds from his 401(k) account and loaned them to the DEBTOR. The DEBTOR repaid the loan to Ashok during 2002.

48. On September 20, 2002, BANK AUSTRIA filed its Verified Complaint to Foreclose on Collateral against the DEBTOR in the Illinois Circuit Court for Rock Island County. On the same day, it filed an Emergency Motion to Appoint a Receiver to take control of the DEBTOR'S business.

49. The BANK'S emergency motion alleged that the DEBTOR was insolvent and that its liquidation value was zero.

50. An *ex parte* hearing, without notice to the DEBTOR, was held on the emergency motion on September 30, 2002, and the state court entered an order appointing a receiv-

er to take control of the DEBT-OR'S business and all of its assets.

51. With the assistance of the Rock Island County Sheriff, the Order Appointing Receiver was served at the DEBTOR'S business premises on October 2, 2002. The receiver immediately fired Ashok Kartham.

52. The DEBTOR filed its voluntary petition for protection under Chapter 11 of the Bankruptcy Code on the afternoon of October 3, 2002. On October 4, 2002, the receiver was advised of the bankruptcy filing and vacated the DEBTOR'S premises.

53. Ashok was immediately rehired and resumed his role as President and CEO of the debtor in possession.

54. Prior to bankruptcy, the DEBTOR'S business was operating at a substantial loss. Since bankruptcy, the DEBTOR'S performance has turned cash flow positive. The DEBTOR attributes its turnaround to the following actions:

a) The DEBTOR is no longer devoting resources to the development of iWarranty, which has been "shelved." The non-revenue producing employees who were working on iWarranty have been laid off or terminated.

b) Salaries have been reduced. A reduction in Ashok's compensation from a pre-petition high of $160,000 to $80,000 was approved by the Court on December 3, 2002.

c) The number of employees has been reduced from sixty-nine or seventy as of the petition date to fifty-three as of December 3, 2002.

d) In order to improve its cash flow, the DEBTOR has begun to offer its customers a discount for early pay-

ment and its accounts receivable are being paid more quickly.

e) The hourly rates charged for its services were increased as of November 1, 2002.

f) Gibraltar has been fully paid and the DEBTOR is no longer incurring any expense related to the factoring of its receivables.

56. The DEBTOR'S Earnings Before Interest, Taxes, Depreciation and Amortization (EBITDA) were $67,000 for October, 2002, and approximately $17,000 for November, 2002.

57. Since the filing, the DEBTOR has remained current on its post-petition payroll taxes and its accounts payable. As of December 3, 2002, the DEBTOR was approximately $55,000 behind on payroll but anticipated being current within a week thereafter.

58. The DEBTOR'S controller anticipates that gross sales for calendar year 2003 will average $350,000 per month yielding a positive EBITDA of $15,000 to $20,000 per month.

59. The Statement of Financial Affairs and the bankruptcy schedules were signed by Ashok, but were prepared, at his direction, by the DEBTOR'S controller, Shawn Hingstrum. Those papers contained the following errors:

a) iWarranty was not scheduled as an asset (later added by amendment).

b) The transfer of $30,000 to WARRANTYSOFT, INC., in September, 2002, was not disclosed.

c) The DEBTOR'S pre-petition repayment of a loan from Ashok was not disclosed.

d) Paragraph 1 of the Statement of Financial Affairs is incomplete in that

the DEBTOR'S gross income for 2000 and 2001 was not disclosed.

60. As of the date of the hearing, the DEBTOR had fulfilled all of its obligations as a debtor in possession in Chapter 11 to the United States Trustee.

## ARGUMENTS OF THE PARTIES

BANK AUSTRIA moves for dismissal of the case, for conversion to Chapter 7 as a first alternative, and for appointment of a Trustee as a second alternative. The BANK argues that the evidence proves cause for dismissal or conversion, including continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation pursuant to Section 1112(b)(1), inability to effectuate a confirmable plan pursuant to Section 1112(b)(2), and for bad faith.

In support of its position that there has been, post-petition, a continuing loss to or diminution of the estate, the BANK points to the fact that the DEBTOR'S cash flow is so poor that it cannot pay its payroll on a timely basis, that the information technology industry is in recession, that iWarranty remains non-revenue producing, and that the DEBTOR'S own projections are for flat revenues for 2003 with a minimal cash flow positive performance. In support of its position that there is no reasonable likelihood of rehabilitation, the BANK maintains that given the size of the IRS debt and of its debt alone, the DEBTOR will not be able to generate enough operating profit to pay down the BANK'S debt over a reasonable period of time, and that the "time and materials" basis that is the current business model for the service side of the DEBTOR'S business, with no guaranteed contracts, is subject to its customers' needs and is speculative. The BANK also points to the steep decline in gross revenues over the past two years, and the inability to attract venture capital or a potential purchaser. In addition to these factors, and in support of its argument that the DEBTOR will not be able to confirm a plan, the BANK asserts that it will never vote for any plan the DEBTOR proposes and that the absolute priority rule precludes cramdown.

In support of its request for dismissal or conversion, as well as its alternative request for appointment of a trustee, the BANK alleges that the DEBTOR'S bad faith and the incompetence of Ashok as a CEO, is evidenced by a laundry list of problematic decisions, as follows:

1. The huge expenditure of resources on the development of iWarranty was a "costly gamble" that never panned out.

2. The decision to stop paying payroll taxes in February, 2002, that resulted in the resignation of the DEBTOR'S CFO.

3. The general refusal to implement many of the recommendations of James Rubenstein, including his advice to cease development of iWarranty.

4. The failure to copyright iWarranty.

5. The decision to have the DEBTOR repay Ashok's loan while payroll taxes went unpaid.

6. The incorporation of WARRANTYSOFT, INC., without the BANK'S knowledge or consent and with no agreement as to the BANK'S interest in such an entity.

7. The fact that 100% of the stock of WARRANTYSOFT, INC., was placed in Ashok's name.

8. The transfer of twelve employees and $30,000 to WARRANTYSOFT, INC.

9. The multiple errors and/or misrepresentations contained in the State-

ment of Financial Affairs and Schedules.

The DEBTOR counters by emphasizing its post-petition financial performance, specifically that it is now cash flow positive. The DEBTOR contends that no post-petition diminution has occurred and that its financial footing is more solid now than when the petition was filed.

The DEBTOR also points out that no other interested party supports the BANK'S position. Most significantly, the IRS, holder of a large priority claim, has not joined in the BANK'S motions. With regard to confirmation, the DEBTOR is confident that at least one impaired class will vote to accept its plan, thereby opening the door to a cramdown via the new value corollary to the absolute priority rule. Admittedly, the DEBTOR relies upon the "white knight" scenario where a third party with a major cash infusion rides in to save the day. Since the 120 day exclusivity period has not yet expired, the DEBTOR argues that it is entitled to a reasonable amount of time to find its "white knight".

The U.S. Trustee supports the DEBTOR and opposes the BANK'S motions. The U.S. Trustee argues that no fraud by the DEBTOR has been proved and that the BANK was aware of and acquiesced in the DEBTOR'S decisions up until WARRANTYSOFT, INC., was formed. Even then, the BANK'S security interest in iWarranty was not in jeopardy as it would have followed any transfer. The U.S. Trustee contends that neither conversion nor dismissal is in the best interest of unsecured creditors. The big unknown is whether iWarranty has any significant value and, if so, how much. The U.S. Trustee supports the DEBTOR'S position that dismissal or conversion is premature and that the DEBTOR is entitled to explore, in the context of Chapter 11, whether it can identify a third party who is willing to invest in the iWarranty product.

### APPLICABLE LEGAL STANDARDS

■■■ The party moving for dismissal or conversion under Section 1112(b) bears the burden of proving by a preponderance of the evidence that cause exists to dismiss or convert the case. *Matter of Woodbrook Associates,* 19 F.3d 312, 317 (7th Cir.1994). The earlier in the Chapter 11 case, the more reluctant courts are, absent some compelling justification, to abort the statutory confirmation process by ordering conversion or dismissal. *In re Chris–Marine U.S.A., Inc.,* 262 B.R. 118 (Bankr.M.D.Fla. 2001). The two recognized policies underlying Chapter 11 are preserving going concerns and maximizing property available to satisfy creditors. *Bank of America Nat. Trust and Savings Assn. v. 203 North LaSalle Street Partnership,* 526 U.S. 434, 453, 119 S.Ct. 1411, 143 L.Ed.2d 607 (1999). Generally, if continuing a Chapter 11 case would promote these two goals, then the case should probably not be converted or dismissed. *In re Orienta Co-op. Ass'n,* 256 B.R. 508, 511 (Bankr.W.D.Okla. 2000).

■■■ In order to establish cause for dismissal or conversion under Section 1112(b)(1), the moving creditor must prove both (1) continuing loss to or diminution of the estate and (2) absence of a reasonable likelihood of rehabilitation. *In re Gonic Realty Trust,* 909 F.2d 624, 627 (1st Cir. 1990). Continuing loss to or diminution of the estate may be established by proving that the debtor is maintaining, post-petition, a negative cash flow position or that there is economic depreciation of its assets. *In re v. Companies,* 274 B.R. 721 (Bankr.N.D.Ohio 2002); *In re Schriock Const., Inc.,* 167 B.R. 569, 575 (Bankr. D.N.D.1994).

## ANALYSIS

### A. Section 1112(b)(1).

█ The evidence is uncontradicted that the DEBTOR has operated on a cash flow positive basis since filing the petition. The DEBTOR did get behind on its payroll but has now caught up. The DEBTOR has accomplished this without the aid of any post-petition credit.

Since the DEBTOR'S business is almost entirely service-based, its physical assets are limited. The DEBTOR owns no real estate or vehicles. Probably its most substantial assets are computers and servers, which are necessary to and are continuing to be used in its service business. The pre-petition accounts receivable have been largely liquidated and used to pay off Gibraltar. The remaining pre-petition receivables are BANK AUSTRIA'S collateral. The evidence indicates that as long as the DEBTOR is operating, the receivables should be fully collectible.

The other potentially valuable asset is the iWarranty product. Although iWarranty has been moth balled since the filing, BANK AUSTRIA, with court authorization, has had the product inspected by an expert who became familiar with it during the brief state court receivership. The expert reported that the product has not degraded or depreciated and is in the same condition as existed just before bankruptcy.

Accordingly, based on the evidence introduced at trial, the Court concludes that BANK AUSTRIA has failed to carry its burden to prove a continuing loss to or diminution of the estate. Therefore, its motion under Section 1112(b)(1) must be denied.

### B. Section 1112(b)(2).

█ Alternatively, BANK AUSTRIA asserts, pursuant to Section 1112(b)(2), that the DEBTOR is and will be unable to effectuate a plan. This provision tests whether it is reasonable to expect that a plan can be confirmed within a reasonable period of time. *In re Woodbrook Assocs.*, 19 F.3d 312 (7th Cir.1994).

The BANK filed its Motion to Dismiss or Convert on October 10, 2002, one week after the petition was filed. The period of exclusivity during which only the DEBTOR may file a plan does not expire until January 31, 2003. The DEBTOR has not yet filed a plan so its terms, at this point, are unknown.

During closing arguments, counsel for the BANK stressed that the BANK will never vote to accept any plan proposed by the DEBTOR. Statements of opposition by creditors at the outset of a Chapter 11 case, however, no matter how strident, are not dispositive of a motion to dismiss because a plan may be confirmed notwithstanding such opposition. *Matter of Bergeron*, 218 B.R. 1003, 1007 (Bankr.E.D.La. 1998). In response to the BANK'S assertion that the absolute priority rule will preclude confirmation in this case, where the DEBTOR admits being unable to pay unsecured creditors in full, the DEBTOR holds out hope that salvation will arrive in the form of a "white knight" who will contribute enough fresh capital to satisfy the new value corollary to the absolute priority rule. Of course, the DEBTOR, with the assistance of James Rubenstein, has been seeking its "white knight" for two years with no success.

The likelihood that the DEBTOR will find a "white knight" is almost entirely dependent upon the saleability of iWarranty, the true value of which is unknown and the subject of wide-ranging speculation. With two modules nearly market-ready, the DEBTOR is entitled to use the protections afforded by Chapter 11, for a reasonable period of time, to facilitate its search

for an investor/purchaser. This follows from the fact that BANK AUSTRIA effectively partnered with the DEBTOR in iWarranty's development. To the extent that the DEBTOR is now profitable and what little collateral the BANK has left is not significantly depreciating, it will not prejudice the BANK to allow the DEBTOR one more chance to find the pot of gold at the end of the iWarranty rainbow. This, in all likelihood, is the only hope that the DEBTOR has of preserving its going concern value and maximizing the property available for distribution to creditors. The evidence also supports the conclusion that whatever value iWarranty has, it is more likely to be realized if marketed by the DEBTOR as a going concern than by BANK AUSTRIA via foreclosure. At this relatively early stage in the Chapter 11 process, the Court will give the DEBTOR the benefit of the doubt that confirmation of a plan within a reasonable period of time is not an unreasonable expectation.

## C. Lack of Good Faith.

▮▮▮▮ BANK AUSTRIA also seeks dismissal on the grounds that the petition was filed in bad faith. Although not expressly enumerated in Section 1112(b), it is well established that a Chapter 11 petition is subject to dismissal for cause if not filed in good faith. *In re SGL Carbon Corp.*, 200 F.3d 154 (3rd Cir.1999); *Matter of Madison Hotel Associates*, 749 F.2d 410 (7th Cir.1984). In evaluating whether a Chapter 11 petition has been filed in good faith, the court should consider the totality of the circumstances. *In re Cedar Shore Resort, Inc.*, 235 F.3d 375 (8th Cir.2000). Perhaps the clearest case of bad faith is where the debtor files Chapter 11 knowing that there is no chance to reorganize the business and hoping merely to stave off the evil day when the creditors take control of the assets. *In re James Wilson*

*Associates*, 965 F.2d 160, 170 (7th Cir. 1992).

▮▮▮ The factors tending to evidence a lack of good faith, include the following:

1. That the debtor has only one asset, in which it does not hold legal title;
2. That the case is essentially a two-party dispute that should be resolved in state court;
3. That there are few unsecured creditors whose claims are small in relation to the secured claims;
4. That the debtor has no ongoing business;
5. That the debtor has few employees;
6. That the timing of the filing evidences an intent to delay or frustrate the legitimate efforts of the secured creditors to enforce their rights against their collateral, such as filing on the eve of a foreclosure sale;
7. The lack of a realistic possibility of an effective reorganization;
8. That the debtor's pre-petition conduct was improper;
9. Falsehoods or inaccuracies in the bankruptcy schedules;
10. The existence of serial bankruptcy filings; and
11. That the debtor is seeking to use the bankruptcy process to create and organize a new business, not to reorganize an existing enterprise or preserve the going concern value of an existing business.

*In re Primestone Investment Partners, L.P.*, 272 B.R. 554 (D.Del.2002); *Singer Furniture Acquisition Corp. v. SSMC, Inc. N.V.*, 254 B.R. 46 (M.D.Fla.2000); *In re Hatcher*, 218 B.R. 441 (8th Cir. BAP 1998), *aff'd*, 175 F.3d 1024 (8th Cir.1999).

▮▮▮ **Factor 1:** This is not a single asset case. The DEBTOR owns no real

estate. In its schedules, the DEBTOR listed accounts receivable valued at $500,000 and office equipment and computers valued at $100,000. The DEBTOR'S customer contracts and iWarranty are scheduled with value "unknown."

**Factor 2**: When the case was filed, Gibraltar was the largest secured creditor, BANK AUSTRIA was the largest unsecured, non-priority creditor, and the IRS was the largest priority creditor. Sixty-seven employees are scheduled as holding priority wage, vacation pay, 401(k) and health insurance claims. The Illinois Department of Employment Security is owed $9,000 priority. In addition, Schedule F lists eighty unsecured claims totaling $317,000. Although BANK AUSTRIA is the largest remaining secured creditor and the largest unsecured creditor, this is far from a two-party dispute of the kind that ought to be resolved in state court.

**Factor 3**: In addition to the large number of unsecured creditors, the aggregate amount of unsecured debt greatly exceeds the amount of secured debt, particularly now that Gibraltar has been paid off.

**Factor 4**: The DEBTOR has continued to operate its core, service business on an uninterrupted basis. Although further development of iWarranty has ceased, that has served to enhance the DEBTOR'S profitability.

**Factor 5**: The DEBTOR had sixty-nine employees at the time of filing. Post-petition staff cuts have reduced that number to fifty-three, still a substantial workforce.

**Factor 6**: The timing of the filing was dictated entirely by the appointment of the receiver by the state court. The DEBTOR had not been contemplating bankruptcy and had not sought bankruptcy counsel until the receiver took control of the business and fired Ashok. The bankruptcy filing was made on an "emergency basis" in response to the state court suit.

It was not a situation, however, where the DEBTOR had "lost" its rights after a lengthy, contested lawsuit. BANK AUSTRIA filed suit to foreclose on its collateral on September 20, 2002. Its emergency motion to appoint a receiver was heard ten days later. The motion was heard on an *ex parte* basis with no notice to the DEBTOR. In fact, the DEBTOR had no knowledge that it had even been sued yet. The DEBTOR had no opportunity to defend itself before the receiver was appointed.

It is often the case that bankruptcy filings are precipitated by creditor lawsuits. In some instances, where a creditor has expended a substantial amount of time and effort to enforce its rights in state court against a stubborn debtor, only to be stayed from executing a judgment by an eleventh hour bankruptcy filing, the debtor may be guilty of bad faith. Under the circumstances of the case at bar, however, this Court will not impute bad faith to the DEBTOR'S resort to bankruptcy in response to the emergency, *ex parte* appointment of a receiver. To do otherwise would be to effectively allow the appointment of a state court receiver to deprive the DEBTOR of its legitimate right to seek bankruptcy relief. *See, In re James Wilson Associates,* 965 F.2d 160 (7th Cir.1992) (affirming denial of motion to dismiss Chapter 11 case filed three weeks after appointment of a state court receiver).

**Factor 7**: For the reasons stated above, the Court cannot conclude, at this stage, that the DEBTOR lacks a realistic possibility to effectively reorganize.

**Factor 8**: BANK AUSTRIA makes much of the DEBTOR'S pre-petition conduct, accusing it of gross incompetence, mismanagement and fraud. Each of the DEBTOR'S employees who testified, as well as James Rubenstein, denied that any

fraudulent conduct occurred by Ashok or anyone else on behalf of the DEBTOR. The BANK points to the secret incorporation of WARRANTYSOFT, INC., owned 100% by Ashok, the transfer of employees and $30,000 to the new entity, and the intention to transfer iWarranty, as evidence of fraudulent conduct. The Court agrees with James Rubenstein's characterization of these events as an act of desperation by Ashok, misguided and ultimately pointless, but not fraudulent. The BANK'S security interest in iWarranty was never in jeopardy since an unauthorized, gratuitous transfer to a related entity would have done nothing to render the security interest unenforceable. Ashok testified that he took a 100% ownership interest in the new corporation only as a short-term measure, with the intent to redistribute the stock once an agreement was reached with the BANK, and the Court finds his testimony credible.

By September, 2002, it is clear that both the BANK and Ashok had lost patience with each other and were frustrated with the lack of progress on the terms of a spin-off. Ashok decided to force the issue by going forward without an agreement and the BANK'S reaction is understandable. The few steps that were taken were quickly undone and neither the BANK nor the DEBTOR suffered any significant financial loss as a result. The payroll expense incurred by WARRANTYSOFT, INC., would have been incurred by the DEBTOR absent the transfer of employees. The Court finds no evidence of pre-petition fraudulent conduct by the DEBTOR.

BANK AUSTRIA paints a broader picture of mismanagement, pointing to the precipitous decline in the DEBTOR'S revenues and profitability since mid–2000, the decision not to pay its payroll taxes resulting in the accumulation of an $800,000 liability and the loss of its CFO, the failure to implement James Rubenstein's suggestions, the repayment to Ashok of his loan while payroll taxes went unpaid, and the whole WARRANTYSOFT, INC. fiasco. In addition, the BANK decries the unprofitable development of iWarranty, characterizing it as a "costly gamble." The Court agrees with that characterization, made now with the benefit of hindsight. But it was also a gamble the risk and expenses of which were known to and accepted by BANK AUSTRIA. Wearing its investment bank hat, with a substantial minority interest in the DEBTOR'S holding company, the BANK acquiesced in and encouraged the development of iWarranty, even to the extent of not protesting the DEBTOR'S decision to stop paying its payroll taxes so that it would not have to lay off its non-revenue producing product-side employees. There is no evidence that the DEBTOR misled BANK AUSTRIA as to iWarranty's status, potential or value. Unfortunately for both parties, iWarranty did not pan out as quickly as hoped. But that is nothing more than the entrepreneurial risk that both parties accepted. BANK AUSTRIA'S attempt to now characterize itself as having been dragged, kicking and screaming, down the iWarranty path is simply not supported by the evidence and its rueful protestations about the wrongheaded development of iWarranty ring hollow.

Based on the testimony of James Rubenstein, the independent expert that the BANK relied upon to keep the DEBTOR honest (recall the "annotated" financial statements), the DEBTOR'S revenue free fall and slide into unprofitability was more a function of a general downturn in the information technology sector than any management decision made by the DEBTOR. There is no evidence that the DEBTOR lost any business or any customers because of problems with its services. Its market simply contracted. Rather than

laying off employees as its service volume and revenues declined, Ashok decided to shift the idle manpower to the non-revenue producing product side, thereby keeping personnel costs at historically high levels in the face of declining revenues. Whether this turns out to have been a ruinous decision remains to be seen. The Court, however, does not view the business decisions made by the DEBTOR or its dealings with BANK AUSTRIA, regrettable though they now appear, as rising to the level of gross mismanagement of a kind that would justify dismissal or conversion of this Chapter 11 case.

**Factor 9**: The DEBTOR'S statement of financial affairs and bankruptcy schedules were prepared, at Ashok's direction, by the controller, Shawn Hingstrum, and were signed by Ashok with only a cursory review of Shawn's work. BANK AUSTRIA exposes several inaccuracies, including the omission of the iWarranty product on Schedule B, the omission of the company's gross income for 2000 and 2001 in Paragraph 1 of the Statement of Financial Affairs, the nondisclosure of the $30,000 transferred to WARRANTYSOFT, INC., the nondisclosure of the repayment of Ashok's loan, and the failure to list the DEBTOR'S 401(k) program in Paragraph 25.

Having heard the testimony of Ashok and Shawn Hingstrum, the Court concludes that these errors were not made with a fraudulent intent. As President and CEO, Ashok should have paid more attention to the accuracy and completeness of the bankruptcy papers. However, the testimony of Ashok, Shawn Hingstrum, and the other employees of the DEBTOR was forthright and the Court perceived no intent to cover up assets or transfers. There is no evidence that the DEBTOR failed to produce any records or documents requested by any party, including BANK AUSTRIA and the U.S. Trustee.

Under these circumstances, the omissions in the bankruptcy papers do not justify dismissal or conversion.

**Factor 10**: The DEBTOR has never before been a debtor in a bankruptcy case. There is no serial filing problem.

**Factor 11**: The DEBTOR is clearly attempting to use Chapter 11 to preserve the going concern value of its pre-petition business and assets in the hope of finding a "white knight" to infuse enough new value to enable it to overcome the absolute priority rule. The DEBTOR'S operating income is derived solely from the operation of the same service-side business as existed pre-petition. Although iWarranty is on ice for the time being, it remains the most likely lure for venture capital. Despite the uncertainty over the amount of its worth, the DEBTOR, BANK AUSTRIA, and James Rubenstein, as well as Mark Ross and Keith Norton, all believe the iWarranty product has significant value. In fact, one of the primary goals of the state court receiver, as dictated by BANK AUSTRIA, was to determine the value of iWarranty and develop a game plan for realizing that value by marketing it for sale. The DEBTOR has the same game plan and is using this Chapter 11 case to see iWarranty come to fruition, but on the DEBTOR'S terms rather than BANK AUSTRIA'S. The DEBTOR'S purpose for the filing is valid and permissible under Chapter 11 and the filing does not constitute an abuse of the bankruptcy process.

Finally, BANK AUSTRIA argues that even if the separate instances of the DEBTOR'S questionable conduct do not individually justify dismissal or conversion, when viewed in the aggregate, they tip the scales against the DEBTOR. This Court disagrees. As argued by the U.S. Trustee, it is in the best interest of the general unsecured creditors to have the Chapter 11 case continue, as that is their only hope

for any payment. The IRS, holder of an $800,000 claim, did not participate in the trial and voiced no support for the BANK'S motion. With few exceptions, the DEBTOR'S employees remain loyal to Ashok, accepting pay cuts and late paychecks. Gibraltar, the largest secured creditor, has been paid off and is out of the picture. At this point, BANK AUSTRIA'S motion is a solo act, not supported by any other constituency. This balance of power is not permanent, however. It is up to the DEBTOR to proceed expeditiously to propose, confirm and consummate a feasible plan of reorganization. Time is not on the DEBTOR'S side.

The Court concludes that even when viewed in the aggregate, the factors discussed above weigh in favor of allowing the Chapter 11 case to continue, at least for the time being, to give the DEBTOR an opportunity to propose a plan, and to solicit approval of its plan and, if necessary, to attempt a cramdown. The BANK'S motion will be denied.

## D. Motion for Appointment of a Trustee.

Section 1104 provides for the appointment of a trustee, as follows:

(a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee—

(1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or

(2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

11 U.S.C. § 1104(a).

The appointment of a trustee in a Chapter 11 case is an extraordinary remedy. There is a strong presumption that the debtor should be permitted to remain in possession and control of its business. *In re Heck's Properties, Inc.,* 151 B.R. 739 (S.D.W.Va.1992). Absent fraud or some other compelling reason, it is preferable to have the Chapter 11 debtor's current management operate the debtor's business, rather than to appoint a trustee. *In re Madison Management Group, Inc.,* 137 B.R. 275 (Bankr.N.D.Ill. 1992). The preference for retention of current management is stronger where the debtor is a closely-held entity whose reputation and good will is closely identified with its owners and/or management team.

The decision whether to appoint a Chapter 11 Trustee must be made on a case-by-case basis. *In re Ontario Entertainment Corp.,* 237 B.R. 460 (Bankr. N.D.Ill.1999). Since the appointment of a trustee will necessarily cause additional expense for the estate, the court must consider the financial cost of appointing a trustee. *Schuster v. Dragone,* 266 B.R. 268 (D.Conn.2001). Inasmuch as one would expect to find some degree of incompetence or mismanagement in most businesses which have been forced to seek Chapter 11 relief, the court must find something more aggravated than simple mismanagement in order to appoint a trustee. *Id.* In determining whether to appoint a trustee, the court may not consider the number of shareholders of the

debtor or the amount of assets or liabilities of the debtor. 11 U.S.C. § 1104(a)(1) and (2).

■ For the reasons discussed earlier in this Opinion, the Court has rejected BANK AUSTRIA'S allegations of fraud. In addition, there is no evidence that Ashok and Anu, as majority shareholders and sole directors, have improperly used their power to line their own pockets. Ashok's compensation and benefits package has at all times been reasonable and there is no evidence that he ever used corporate funds to pay personal expenses.

Having considered all of the evidence in its totality, the picture that is painted is one of rapid entrepreneurial success, followed by the creation of a potentially revolutionary idea (iWarranty), followed by an unrelenting devotion to the development of that idea, leading to ever more risky asset allocation decisions, resulting in a race against time to complete the development and sale of the product. When BANK AUSTRIA ran out of patience, the DEBTOR ran out of time, and bankruptcy was inevitable.

As any entrepreneur knows, there is a fine line between calculated risk taking and foolhardiness. What the BANK calls gross mismanagement, the DEBTOR calls calculated risk. The evidence favors the DEBTOR. BANK AUSTRIA and the DEBTOR were, in effect, joint venturers with respect to iWarranty. By the year 2000, the BANK'S investment in and loans to the DEBTOR were sunk costs. When revenues dropped off, both parties realized that the only way that the BANK would be paid was if iWarranty came to fruition. By February 2002, with Gibraltar's credit maxed out, BANK AUSTRIA unwilling to lend more, and no other source of funds available, the DEBTOR, caught between the devil and the deep blue sea, opted to make the IRS its involuntary lender. The BANK went along with that decision even though it realized that priority debt that would prime its largely unsecured claim was accumulating at a swift rate. Both the DEBTOR and the BANK must have believed that the break-out sale of one or two of the iWarranty modules was just around the corner. That belief turned out to have been erroneous, but the evidence indicates that it was based on a rational, albeit optimistic, view of the marketability of the product. The Court cannot say that the DEBTOR'S decisions relating to iWarranty rose to the level of gross mismanagement or incompetence.

The BANK also contends that Ashok has engaged in a pattern of dishonesty, pointing primarily to the creation of WARRANTYSOFT, INC., organized on the sly without the BANK'S knowledge or authorization, as well as the misstatements on the bankruptcy papers. For the reasons discussed earlier, the Court does not view these events as evidencing a pattern of dishonesty by Ashok that would justify appointment of a trustee.

Neither does the Court find that the appointment of a trustee is in the interests of the creditors and equity security holders. The debtor in possession has able bankruptcy counsel, is fulfilling its obligations under the Bankruptcy Code, and is operating at a profit. Under all of the circumstances, the Court holds that the BANK'S Motion for Appointment of a Trustee should be denied.

This Opinion constitutes this Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate Order will be entered.