**In re Elizabeth T. DILLING, Debtor.**

No. 04–35474.

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

Feb. 24, 2005.

Steven Jakubowski, Robert F. Coleman & Associates, Chicago, IL, for Jane Doe, Movant.

Fred R. Harbecke, Chicago, IL, for Elizabeth Dilling, Debtor.

## MEMORANDUM OPINION

PAMELA S. HOLLIS, Bankruptcy Judge.

This matter comes before the court on creditor Jane Doe's Motion to Dismiss, or, in the Alternative, to Convert to Chapter 7 or to Appoint a Chapter 11 Trustee ("Motion"). Doe argues that dismissal is warranted, alleging that the debtor, Elizabeth Dilling, filed this chapter 11 case in bad faith. Alternatively, Doe contends that this case should be converted to a chapter 7 liquidation bankruptcy because Dilling has no business to reorganize. Doe further asserts that even if the case is not dismissed or converted, a chapter 11 trustee must be appointed because Dilling attempted to conceal and failed to preserve her assets. This court held an evidentiary hearing on January 19, which concluded on January 21, 2005. For the reasons stated below, Doe's Motion is denied.

### Findings of Fact

#### The State Court Judgment

1. On March 2, 2004, following a jury trial in the Circuit Court of Cook Coun-

ty, Illinois, Doe was awarded a $2 million judgment against Dilling, individually, and as Administrator of her husband Kirkpatrick Dilling's estate. *Doe Exh. 61, Doe Proof of Claim, Exhibit A, Jury Verdict Form A.* Doe's attorneys describe the judgment as resulting from the "... Dillings' fraudulent misrepresentations to plaintiff." *Attachment to Proof of Claim.* The Dillings filed a timely notice of appeal from the judgment, which was described by their attorney in a verified motion as:

1. This case presents issues of first impression in Illinois and perhaps the nation, regarding the application of the tort of misrepresentation to personal injury as well as the application of the lost chance doctrine outside a medical malpractice setting.

2. Nine months before she met Elizabeth and Kirkpatrick Dilling, the plaintiff, age 45, [Jane Doe] was allegedly infected with HIV by their son, 43—year-old Albert Dilling, a non-party. Plaintiff sued defendants on the theory that they knew their son was HIV positive and failed to tell her. As a consequence, plaintiff claims that she was deprived of an opportunity to seek early treatment for her infection and it developed into AIDS.

*Revised Emergency Motion to Stay Enforcement of Judgment, Approve Security, and Extend Time to Post Security,* filed in the Appellate Court of Illinois, First Judicial District, No. 1–04–2372, attached as Exhibit A to Jane Doe's *Motion for an order Requiring Debtor to Comply With the Bankruptcy Code 362 and 364,* filed in this bankruptcy proceeding on or about February 11, 2005.

### The Parties

2. The Debtor, Elizabeth Dilling, is 82 years old. Her husband passed away on June 19, 2003 at age 83.

3. Creditor Jane Doe is self employed and currently without medical insurance. From at least May 2001 up to the present, her AIDS was treated at Northwestern University Hospital through a clinical trial program. During this four year program, Doe's medical care and medications were administered at no charge or very little cost to her. Her condition improved. However, this clinical trial ends March 1, 2005. Although Doe can obtain certain medications at no cost from Cook County Hospital, it will take approximately $50,000 a year to continue to treat her with the type of medication she is receiving at Northwestern. Doe's current regimen of medications is not available from Cook County. *Testimony of Donna McGregor, RN, MS, NP, Nurse Practitioner, Division of Infectious Diseases, Northwestern University.*

### Efforts to Obtain Bond to Stay Execution of State Court Judgment

4. The value of Dilling's assets total approximately $2,300,000.00. This includes the amount Dilling expects to receive as sole heir to her husband's probate estate ("Kirkpatrick Estate"). *Dilling First Amended Schedules, filed January 12, 2005 and Summary, Doe Exh. 97.*

5. When interest is added to the judgment, it is likely that Dilling's assets will be less than the total amount owed to Doe if the judgment is not reversed on appeal.

6. In an effort to stay execution of the judgment pending appeal, Dilling tried to obtain an appellate bond or letter of credit. She was unsuccessful because she did not have sufficient liquid

assets to secure the bond or letter of credit. *Dilling Affidavit, August, 31, 2004, Doe Exh. 75.*

7. Dilling also tried to obtain a stay both in the trial court and in the appellate court by offering alternative security. This offer was pursuant to Illinois Supreme Court Rule 305(a), which authorizes a court to approve security or a bond in the "maximum amount reasonably available to the judgment debtor ...". The Rule provided that if the security was less than the amount of the judgment, the court could impose conditions on the judgment debtor to prevent dissipation of assets. Among other things, Dilling offered to place title to all real estate in escrow, deposit rents in special accounts to pay only property expenses, keep all securities and sale proceeds in her brokerage accounts until further order of court, and not withdraw funds from checking except for disclosed budgeted living expenses. *Doe Exh. 75.* Dilling's attempt to stay execution under Illinois Supreme Court Rule 305 was denied in both the trial and appellate courts on September 7th and 16th, 2004, respectively. *Id. and Doe Exh. 77.*

8. In the meantime, on May 4, 2004, Doe properly served Dilling with a Citation to Discover Assets, effectively creating a lien on all of Dilling's non-exempt personal property as of that date under Illinois law. 735 ILCS 5/2–1402(m); *Cacok v. Covington,* 111 F.3d 52, 54 (7th Cir.1997). The lien is considered perfected as of the date of service of the citation. *Appeal of Swartz,* 18 F.3d 413, 416 (7th Cir.1994) Although Dilling could have filed this bankruptcy within 90 days of the creation of Doe's lien, and tried to avoid Doe's security interest as a preference under 11 U.S.C.

§ 547,[1] Dilling did not file this case until September 23, 2004, well after the expiration of the preference period.

9. The timing of Dilling's bankruptcy filing effectively ensured that Doe's judgment would more than likely remain secured during this bankruptcy.

10. Even after the commencement of this bankruptcy, Dilling's efforts to post security pending her appeal continue, as evidenced by her and the Kirkpatrick Estate's recent motion requesting the appellate court to consider whether her daughter's letter of credit, backed by securities, would be sufficient. *See Revised Emergency Motion to Stay Enforcement of Judgment, Approve Security, and Extend Time to Post Security,* filed in the Appellate Court of Illinois, First Judicial District, No. 1–04–2372, attached as Exhibit A to Jane Doe's *Motion for an order Requiring Debtor to Comply With the Bankruptcy Code 362 and 364,* filed in this bankruptcy proceeding on or about February 11, 2005.

11. This Court finds that Dilling's efforts to obtain an appellate bond or other form of security have not only been reasonable, but exhaustive.

### Conversion of LaSalle Account Funds Into Cashiers' Checks

12. Following Doe's judgment, Dilling engaged in several financial transactions, which while not proper, did not materially reduce the amount of her assets available to satisfy the Doe judgment.

13. Dilling's attorney in the state court litigation, Peter Bustamante, testified that although he was not a bankruptcy attorney, he was involved in

---

1. Dilling would have to prove she was insolvent at the time the citation lien was created, but the size of Doe's judgment would assist that effort.

counseling Dilling about her options following Doe's judgment. Bustamante testified that he told Dilling to "... get her money out of LaSalle Bank or her assets would be frozen."

14. On or about March 3, 2004, Dilling withdrew funds from LaSalle Bank and established a new checking account in the name of "Elizabeth Rummel," Dilling's sister-in-law.

15. Dilling testified that she originally did this to remove some funds from her name in order to have living expenses in case her assets were frozen. When Bustamante discovered this, he told her it was improper. She immediately closed the account and placed the funds back in her name.

16. Although Bustamante did not tell Dilling to put the remaining money from the closed LaSalle accounts into cashiers' checks, Dilling testified that she did not know what else to do with the money after the LaSalle accounts were closed, so with the exception of the Rummel account, referred to above, on March 3, 2004, Dilling converted the remaining portion of $269,832 from the closed LaSalle accounts into cashiers' checks.

17. Dilling was deposed three times pursuant to Doe's citation. She gave testimony on July 20, August 2, and September 7, 2004. Dilling did not conceal the existence of these cashiers' checks, which she disclosed during her second deposition when asked questions about withdrawals from the LaSalle accounts.

18. By that time, Dilling had paid certain bills with some of the checks and was still holding approximately $177,000 worth of cashiers' checks. The day after this bankruptcy was filed, Dilling deposited $177,482.98 into her debtor in possession account. This represented the proceeds from the cashiers' checks minus certain bills that were paid.

19. Dilling was able to account for the difference between the money removed from the LaSalle account after the Doe judgment and prior to her bankruptcy and the money re-deposited on the date of her bankruptcy.

20. On August 17, 2004, she paid her accountants' invoice for $7,350.00, which related to preparation of 2003 tax returns involving rental properties owned by Dilling.

21. In March of 2004, Dilling paid her appellate attorney, David Novoselsky, a $25,000 retainer to handle the appeal from the Doe judgment.[2]

22. In connection with her application for an extension to file her 2003 tax return, on or about April 4, 2004, Dilling paid the United States Treasury $30,000, which was the balance due according to Part III of the extension application as prepared by her accountants. In addition, she paid approximately $10,000 to the United States Treasury in estimated taxes in late spring or early summer.

23. Also on or about April 4, 2004, $4,000 was remitted to the Illinois Department of Revenue in connection with an automatic extension payment form.

24. Subtracting these payments left about $16,000, which was paid to her attorney Bustamante—$10,000 in July and $6,000 by cashiers' checks.

25. Aside from these bills, all the money that was removed from the LaSalle account and converted into cashiers' checks was re-deposited into Dilling's debtor in possession account.

---

2. Dilling paid Novoselsky $5,000 directly and reimbursed her daughter Vicki for $20,000 advanced by her to Novoselsky. *Debtors Exh 3C and 3C(i)*.

26. The large tax payments, as well as the appellate attorney retainer, occurred prior to the service of Doe's citation to discover assets.

27. Dilling's attorney Bustamante testified he did not realize that the citation prohibited payments to him and Dilling testified she also was unaware this was prohibited under the citation. Nevertheless, the identity of every payee was accounted for.

### Combining Husband's Estate With Personal Assets

28. After the death of her husband in 2003, Dilling became executor of his estate.

29. On or about June 26, 2004, Dilling transferred all the cash in the Kirkpatrick Estate to her own personal account.

30. She also removed securities from a safety deposit box, which belonged to the Estate, believing that it would be more prudent to place the assets with a LaSalle Bank broker than to just leave the securities in the box.

31. Before Dilling consolidated the accounts, it was never explained to her that she would need a court order to transfer assets from the Kirkpatrick Estate to herself. She thought consolidation of the estate's accounts with hers was permissible since she was the sole heir to her husband's estate.

32. Aside from certain estate obligations, all the funds from the Kirkpatrick Estate were transferred into Dilling's name to consolidate accounts, where they currently remain.

33. Sometime after the transfer Dilling learned from her estate attorney that the Kirkpatrick Estate accounts should have remained separate from her personal assets.

34. However, the improperly consolidated assets were preserved for benefit of creditors. Bank statements indicate that from December of 2003 to December of 2004, the value of the account increased by approximately $48,000–or twenty percent.

35. Dilling presently understands the legal distinction between her personal and the Kirkpatrick Estate funds and is willing to transfer the assets back to the Kirkpatrick Estate.

36. On or about October 14, 2004, as executor of the Kirkpatrick Estate, Dilling settled a $76,479.41 claim filed in probate court by the Adelle Davis Foundation and the Attorney General for the State of California for $40,000. The state filed a proof of claim to recover a loan made by the Foundation to Dilling's husband to fund a nutrition company called Nutradelle. The Kirkpatrick Estate and Dilling obtained a release from the foundation as a result of the settlement.

37. Dilling agreed to settle the loan claim for $40,000 since she was informed by the Attorney General's lawyer that the state would agree to a discounted settlement if the Kirkpatrick Estate paid the $40,000 immediately.

38. Dilling settled the Foundation claim after Doe had properly issued a Citation to Discover Assets against Dilling individually and as executor of the Kirkpatrick Estate. The Citation does prohibit the transfer of funds "... belonging to the judgment debtor ..." but no evidence was introduced or legal argument made whether or not Doe could have executed on loan proceeds from or actually belonging to the Foundation in light of the California Attorney General's involvement.

39. On or about July 18, 2003, nearly a year before Doe's judgment, Dilling

closed a Nutradelle account containing $7,818.21 shortly after her husband's death. At the time she closed this account and remitted the proceeds to herself, she was not aware that Nutradelle owed any money to the Adelle Davis Foundation.

### Dilling's Conduct Did Not Materially Reduce the Amount of Assets Available to Creditors

40. Although Dilling effected some improper transactions following the death of her husband and the Doe judgment, no assets were hidden.

41. To the extent that some debts should not have been paid without a court order, all payees have been identified and accounted for, and there may be recourse to recover funds that were paid without redress to the proper court.

42. When Dilling's attorneys told her that a particular transaction was improper, she took immediate steps to reverse it or has indicated a willingness to do so.[3]

43. Overall, the assets of Dilling and the Kirkpatrick Estate have not been materially reduced by Dilling's improper acts, except for payment of legitimate obligations, many of which were accomplished before the issuance of Doe's citation.

44. Indeed, the majority of payments were arguably necessary to preserve the value of Dilling's assets, such as real estate taxes, etc.[4] Although Dilling's schedules did not initially include every asset, she has amended them to add items.[5] It would not be unusual for a widow in her eighties to initially omit some insignificant items that might have been primarily administered or controlled by her late husband.

45. With the exception of legitimate costs required to maintain the assets, Dilling's present net worth has not materially declined from the time the Doe judgment was entered, and Dilling's deviation from some legal rules and procedures did not meaningfully reduce what would be available to satisfy the Doe judgment.[6]

46. Together with the advice of bankruptcy counsel, Dilling is presently competent to remain a debtor in possession of her assets. Dilling graduated from high school in 1940 and received a post high school degree from a school of

---

3. Surprisingly, Doe's attorneys have not sought a transfer of assets back to the Kirkpatrick Estate, since these assets would not be protected by the automatic stay and available for immediate execution on the Doe judgment, particularly in light of Dilling's testimony that she would willingly return these assets to the probate estate.

4. Dilling's November 2004 report discloses payment of real estate taxes. Depending on whether this was in the ordinary course, Dilling may not have been required to seek bankruptcy court approval. *See 11 U.S.C. §§ 363, 1107 and 1108.* The same argument could be made regarding the liquidation of certain stocks, provided the proceeds were re-invested or were not transferred out of the estate. No evidence was produced by Doe that these actions were outside the ordinary course and it certainly is not clear on the facts presently before the court. Indeed, failure to pay real estate taxes could be an independent basis for conversion or dismissal of Dilling's chapter 11 case, particularly if the value of Doe's collateral declined as a result of tax liens and interest penalties accruing postpetition.

5. Three "metals" funds were disclosed by Dilling to the attorney for the United States Trustee during the creditors' meeting.

6. Dilling admitted to the payment of two relatively insignificant credit card bills from Lord & Taylor and Citicard, which were prepetition debts. These unauthorized payments can be recovered for the benefit of Dillings' creditors pursuant to 11 U.S.C. § 549.

commerce in 1942. She monitors her security investments by subscribing to investment newsletters (two of which she specifically identified for Doe's attorney) and consulting with her stock broker at LaSalle Bank. She currently manages three rental properties titled in her name and managed as many as ten rentals within the last two or three years. She has been managing rental properties since 1966.

47. No evidence was introduced to show any lack of care in either Dilling's management of the rental properties or the securities investments.

48. Doe's questioning of Dilling's competence to remain in possession of her assets primarily related to her "lay person's" limited understanding of probate and bankruptcy law procedures and restrictions. Dilling's effort to consolidate the probate estate with her own assets was not an attempt to secrete the probate assets as they were placed in her name. There was no evidence that her probate attorney warned her in advance not to do. Testimony showed that he only stated it was improper after Dilling consolidated the assets and she is willing to correct that mistake.

49. As to her conduct in this bankruptcy case, the court observes that even bankruptcy attorneys, in addition to their clients, are often unaware of all the technical requirements in Chapter 11, or the requirements are not clear—such as what expenditures are outside the ordinary course of the debtor's business and require court approval. Rarely is a case filed where there are not some immaterial deviations from the bankruptcy code's thicket of code provisions and special rules. This is not to say that such rules will not be vigorously enforced by this court. However, there are means to ensure compliance other than dismissal, conversion of the case or appointment of trustee, unless a pattern of non-compliance develops.

50. To date, this court concludes that Dilling has for the most part adhered to her obligations as a debtor in possession.

### Legal Discussion

■ Good faith is generally recognized as a prerequisite for eligibility to file a chapter 11 case. Lack of good faith can constitute "cause" for dismissal of the case under § 1112(b) of the Bankruptcy Code. *In re Madison Hotel Associates,* 749 F.2d 410, 426 (7th Cir.1984). Doe has the burden of proving that Dilling filed her case in bad faith. *In re N.R. Guaranteed Retirement, Inc.,* 112 B.R. 263, 273 (Bankr. N.D.Ill.1990); *In the Matter of Woodbrook Associates,* 19 F.3d 312, 317 (7th Cir.1994). "The earlier in the Chapter 11 case, the more reluctant the courts are, absent some compelling justification, to abort the statutory confirmation process by ordering conversion or dismissal." *In re 4 C Solutions, Inc.,* 289 B.R. 354, 364 (Bankr.C.D.Ill. 2003). "... [D]enial of access to bankruptcy relief at the initial stages of the proceeding is inherently drastic and should not be employed as an easy alternative to other post-petition creditor remedies." *In re Fox,* 232 B.R. 229, 237 (Bankr.D.Kan. 1999).

■ The nature of Doe's judgment against Dilling and her late husband is novel. While this court is not familiar with the underlying state court proceedings that produced the judgment, and could not predict how the Illinois Appellate Court will rule, it is not unreasonable to conclude that Dilling's appeal might succeed. Accordingly, it is important to balance the rights of Dilling with the rights of Doe, her principal creditor. *In re N.R. Guaranteed Retirement, Inc.,* 112 B.R. 263, 274 (Bankr. N.D.Ill.1990).

If this bankruptcy is dismissed, Doe can collect close to the full amount of her judgment by forcing the sale of Dilling's assets, including three rental properties, and her personal residence. This is likely to occur before Dilling's appeal is resolved and may result in rapid liquidation of illiquid assets that will not maximize their value. Moreover, if this case is dismissed or converted to a chapter 7, which would result in a near total liquidation and payment to Doe, Dilling, an elderly woman, may never be able to restore her financial situation to the status quo. Even if Dilling could recover funds that Doe executed on and the substantial sum that is likely to be paid to Doe's attorneys, the funds recovered may never compensate Dilling for losses arising due to the forced sale of her home, three properties and other securities. "Certain assets of Debtor are worth more if liquidated in an orderly and controlled manner rather than at a forced sale." *Fox*, 232 B.R. at 235.

In contrast, Doe's rights can be protected in this bankruptcy case without invading all of Dilling's interests before the appeal is decided. Although Doe's counsel focuses on dismissal or conversion, remedies are available to fund the approximate $50,000 a year it takes to administer medical care and the preferred regimen of drugs to Doe pending resolution of Dilling's appeal and/or confirmation of a chapter 11 plan.[7] For example, certain assets of the Kirkpatrick Estate should be transferred back to the probate estate. Doe could make such a motion and then execute on the Kirkpatrick Estate assets by following probate court procedures. Based on the evidence at trial, this should make available over three years of medical

care to Doe as the Estate appears to own over $150,000 in liquid assets. Also, Doe's status as a secured creditor in this bankruptcy entitles her to "adequate protection", which affords additional opportunities to receive cash payments from the Dilling estate. Curiously, Doe's counsel has not sought either of these remedies to assist Doe as her clinical trial expires on March 1, 2005.

The law does not dictate a result inconsistent with the court's belief that the respective rights of the parties are best balanced by keeping this matter in chapter 11 for the time being. This is not a case like *In re Liptak*, 304 B.R. 820 (Bankr.N.D.Ill. 2004) where a debtor has substantially more than enough assets to pay the judgment, but instead prefers bankruptcy to try and collaterally attack the judgment and avoid posting an appeal bond. In *Liptak*, the debtor's assets exceeded ten million dollars, although his former wife's judgment, which he sought to collaterally attack in bankruptcy, was only about two million dollars. In granting the motion to dismiss, Judge Cox noted that Liptak's liquid funds in one Chicago account, alone, could satisfy the judgment. Here, with interest running, it appears that Doe's judgment may be close to exceeding all of the assets held by Dilling.

■ Doe's cases in support of bad faith dismissal do not involve the same type of facts that exist here. Dilling is appealing the Doe judgment in state court and is not using this bankruptcy as a litigation tactic to foil state court proceedings as in *Liptak*, or *In re American Telecom Corp.*, 304 B.R. 867 (Bankr.N.D.Ill.2004) (officers

---

7. In balancing Dilling's desire to delay matters until the appeal is resolved against Doe's need for medical care, this court denied Dilling's motion to extend her exclusive period for filing a plan of reorganization. This

means that Doe's attorneys are free to come forward with a plan first and need not fear extensive delay that is controlled by Debtor. To date, Doe has taken no steps to propose a plan.

placed corporate shell into chapter 7 bankruptcy with no other purpose than to wrest control of alter ego action filed in state court from creditor). Using the bankruptcy to collaterally attack the underlying state court judgment is the usual context in which the bankruptcy case is dismissed as nothing more than a "two party dispute." *In re Paolini*, 312 B.R. 295, 307 (Bankr.E.D.Va.2004); *Liptak*, 304 B.R. at 831–832. Such dismissals do not hold, nor could they, that a bankruptcy is filed in bad faith solely because the debtor has only one creditor. Indeed, filing a chapter 11 case because of one large judgment is not at all unusual. *In re Texaco, Inc.* 254 B.R. 536, 541 (Bankr.S.D.N.Y.2000) ("Texaco filed under Chapter 11 for the sole purpose of compromising a $10.5 billion judgment.") There is no support in the Bankruptcy Code for the notion that a debtor must have more than one creditor to file bankruptcy, especially when the creditor's claim equals or exceeds the debtor's assets, as is the case here.

■ There is little doubt that Dilling's motivation in filing this case was prompted by her inability to post an appeal bond. Although bankruptcy cases have been dismissed when the debtor was able to post such a bond, but elected not to do, that is not the situation here. Dilling is making every effort to post security during her appeal, but so far remains unsuccessful. It is generally accepted that a bankruptcy case will not be dismissed, even when used as a substitute for an appeal bond, when the debtor has made diligent efforts to post such a bond but failed. *N.R. Guaranteed Retirement*, 112 B.R. at 272.

Doe's case, *In re Erkins*, 253 B.R. 470 (Bankr.D.Idaho 2000), does not appear to follow the majority rule. However, upon closer study, it is evident that the court was not convinced that the debtor had done all it could do to obtain an appeal

bond. *Id.* at 473 (judgment was about four million dollars while assets were worth over 16 million); *id.* at 474 (record is unclear as to whether debtors were continuing to seek an appeal bond). To the extent that *Erkins* can be construed to stand for the general rule that bankruptcy cannot be used to stay execution on a large judgment when the debtor tried but cannot obtain an appeal bond, this court rejects such a rule as contrary to the spirit of fresh start concepts in bankruptcy and contrary to the majority of cases declining to adopt such a *per se* basis for dismissal. *Fox*, 232 B.R. at 234.

The facts in *In re Marshall*, 298 B.R. 670 (Bankr.C.D.Cal.2003) more closely match the situation here than any of the cases cited by Doe. In *Marshall*, the creditor argued that Howard Marshall's chapter 11 case was filed in bad faith for the following reasons: 1) Marshall was solvent; 2) Marshall purposely concealed assets or misled the court as to the value of certain scheduled assets; 3) the timing of the petition was a litigation tactic to prevent enforcement of the Texas state court judgment; 4) Marshall filed the bankruptcy to avoid posting a supersedeas bond; and 5) Marshall was not able to propose a confirmable plan. The court rejected these arguments and denied the judgment creditor's motion to dismiss on grounds of bad faith filing. Like here, the judgment of $12 million against Marshall was approximately the same amount of his total assets. Marshall tried to obtain an appeal bond, but like Dilling, was unsuccessful. Also as in this case, some assets were initially omitted from the schedules but later disclosed. The court determined, as this court found here, the inaccuracies were not material enough to warrant dismissal. *Marshall*, 298 B.R. at 678.

Additionally, this court is hard pressed to see how the timing of Dilling's bank-

ruptcy filing establishes bad faith. Dilling could have filed bankruptcy within 90 days of Doe's citation lien and attempted to avoid the lien as a preference under 11 U.S.C. § 547. She did not do so, and instead waited until both the trial and appellate courts refused her offer of alternative security in lieu of an appeal bond. If anything, Dilling's timing favored Doe, since Doe will enjoy treatment as a secured creditor in this proceeding, and will not have to defend and/or risk the avoidance of her security interest on preference grounds. This benefit to Doe is purely a function of Dilling's election to wait and file bankruptcy after attempts to stay execution in state court failed. It is no proof of bad faith.

At this early stage, the court also declines to appoint a trustee or convert Dilling's case to a chapter 7 liquidation. "The appointment of a trustee is an extraordinary remedy that requires proof by clear and convincing evidence." *In re Bellevue Place,* 171 B.R. 615, 623 (Bankr. N.D.Ill.1994). While Dilling engaged in some questionable transactions, they did not materially reduce the amount of assets presently available to Doe. The court agrees with the conclusion reached in *Marshall:* "The issue of concealed or undervalued assets is principally relevant to whether the chapter 11 plan should be confirmed. There is no evidence of the sort of wholesale fraud that might give rise to a finding of bad faith on these grounds." 298 B.R. at 683.

## Conclusion

In balancing the interests of both Dilling and Doe, this court concludes that Dilling may proceed with her chapter 11 case and remain in possession of her assets at this time. Jane Doe's Motion to Dismiss, or, in the Alternative, to Convert to Chapter 7 or to Appoint a Chapter 11 Trustee is hereby denied.